JUDGE BATTS



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CIV 5545

RECEIVED
JUN 18 2008
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| VINCENT BATTISTA and<br>MARIE BATTISTA<br><br>Plaintiffs,<br><br>VS.<br><br>ABEX CORPORATION, ET AL.<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br><br>CIVIL ACTION NO.: _____ |

## GENERAL ELECTRIC COMPANY'S NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF UNITED STATES DISTRICT COURT:

Pursuant to Title 28 U.S.C. § 1442(a)(1) and 1446, Defendant General Electric Company ("GE"), gives notice of removal of an action filed against it in the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York. In support, GE respectfully offers the following:

### Preliminary Matters

1.      On, or about, April 11, 2008, plaintiffs filed this lawsuit, entitled  Vincent Battista and Marie Battista, Index No. 08-105277 against GE and numerous other defendants in the Supreme Court of the State of New York, County of New York. *See* Summons and Complaint attached hereto as Exhibit A.

2.      Plaintiffs served GE with Plaintiffs' Summons and Complaint on, or about, April 23, 2008. The Complaint did not state plaintiffs' claims in a manner or in sufficient detail to inform GE that the case was removable. *See Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 698 (S.D. Tex.

2002) (stating that if the initial pleading does not provide details of plaintiff's claims, the 30-day time period begins on the date defendant receives "other paper" specifically indicating grounds for removal). Plaintiffs' counsel forwarded a copy of Plaintiffs' Answers to Defendants' Fourth Amended Standard Set Of Interrogatories ("Discovery Responses") on May 23, 2008. *See* Discovery Responses attached hereto as Exhibit B. Plaintiffs Responses include allegations that plaintiff was exposed to asbestos while serving in the United States Navy ("Navy") and working on a Navy Ship. *Id.* at Chart A. Specifically, there are allegations of exposure while working as a seaman on the USS Burdo between 1949 and 1952. *Id.*

3.    Thus, this Notice of Removal is timely filed in that it is filed within thirty (30) days after the first receipt by GE of "other paper" from which it ascertained that this case is removable. 28 U.S.C. § 1446(b).

## Nature Of The Case

4.    The case is based on plaintiffs' allegations that Vincent Battista's asbestos-related disease, specifically mesothelioma, was caused by his exposure to asbestos dust and/or fibers.

5.    Plaintiffs assert failure to warn claims against GE along with strict liability and negligence claims against the other defendants based on various theories.

## Grounds For Removal

6.    This Notice of Removal is filed within thirty (30) days of GE's receipt of Plaintiffs' Responses to Defendants' Fourth Amended Standard Set of Interrogatories, which constitutes "other paper". 28 U.S.C. § 1446(b). GE manufactured marine steam turbines for use on Navy ships pursuant to contracts and specifications executed by the U.S. Navy. GE has confirmed that its marine steam turbines were on the USS Burdo. The basis for removal is that, in the manufacture and sale of turbines and other equipment for the U.S. Navy, including all aspects of warnings associated

with those turbines and equipment, GE was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

7.       Should plaintiffs file a motion to remand this case, GE respectfully requests an opportunity to respond more fully in writing, but offers the following authorities at this time:

8.       As recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988), GE has a federal defense to this action, *i.e.,* government contractor immunity from liability for injuries arising from any exposure to asbestos related to turbines on board U.S. Navy vessels, insofar as they were constructed or repaired by GE.  Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office.  *Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989).

9.       One New York Federal Court has reviewed this issue as recently as February 2004.  In *Isaacson v. Dow Chemical Company*, 304 F.Supp.2d 442 (E.D.N.Y. 2004), plaintiff originally sued the manufacturer of Agent Orange in New Jersey State Court.  Defendants removed to federal court asserting, among other things, federal jurisdiction under the All Writs Act. *Id.* at 445.  The New Jersey District Court found removal appropriate under the All Writs Act. *Id.*  The case was then transferred to the Eastern District of New York by the Multidistrict Panel. *Id.*  The Court of Appeals for the Second Circuit affirmed the district court's denial of remand finding jurisdiction appropriate under the All Writs Act.  *Stephenson v. Dow Chemical Company*, 273 F.3d 19 (2d Cir. 2003).  On review, the United States Supreme Court remanded the case finding that the All Writs Act alone would not support removal.  *Dow Chemical Company v. Stephenson*, 539 U.S. 111 (2003).  On

remand from the Supreme Court, the Second Circuit determined that jurisdiction could not be grounded in the All Writs Act and remanded the case back to the Eastern District of New York to determine if there was an alternative ground supporting federal jurisdiction. *Stephenson v. Dow Chemical Company*, 346 F.3d 19 (2d Cir. 2003). It is with that extensive procedural history that the district court examined the federal officer removal statute and found it sufficient to deny plaintiff's motion to remand. *Isaacson,* 304 F.Supp. at 445.

10.    In reaching its conclusion, the *Isaacson* court discussed in detail the three elements necessary for removal under this statute. First, a defendant must demonstrate that it is a "person" within the meaning of the statute. *Id.* at 446. The definition of a "person" includes a corporation. *Id.* Second, the defendant must establish that the suit is "for any act under color of federal office," i.e., there is a causal connection between the charged conduct and asserted official authority. *Id.* (citations omitted). Causation exists if the predicate acts of the state court suit were undertaken while the person was acting as or under a federal officer, and the acts were under color of the relevant federal office. *Id.* Third, defendants must raise a colorable claim to a federal law defense. *Id.* As previously stated, a colorable claim to a federal defense can be predicated upon the federal government contractor defense. *Id.* at 449.

11.    The second element requires a causal nexus between the defendant's actions under the federal officer and plaintiff's state court claims. *Id.* at 447. A substantial degree of direct and detailed federal control over defendant's work is required. *Id.* What constitutes sufficient federal control is often central to a court's decision to uphold removal or remand a case. Several courts have upheld removal because defendants were sued as a result of building products pursuant to military specifications. *See Crocker v. Borden*, 852 F.Supp. 1322 (E.D.La. 1994)(holding that removal was

proper for Westinghouse because its marine turbines were manufactured pursuant to Navy specifications); *see also, Pack v. AC and S, Inc.*, 838 F.Supp. 1099 (D.Md. 1993)(holding that removal was proper for Westinghouse because the government had extensive control over the manufacture of turbines, even specifying the type of asbestos cloth). Not all courts agree, however, on the amount of federal control necessary to uphold removal under this statute.

12.    New York courts have not always viewed this issue consistently.  Prior to the *Isaacson* case, the Eastern District Court remanded a similar matter involving Agent Orange.  In *Ryan v. Dow Chemical Company*, 781 F.Supp. 934, 950 (E.D.N.Y. 1992), the district court remanded the case because it found that the control by the government was not sufficient to meet the requirements of section 1442(a)(1).  The district court reasoned that the government sought only to buy a ready-to-order herbicide from the defendant and did not cause or control the production of the unwanted byproduct, dioxin, which was the alleged cause of the injuries. *Id.*

13.    In discussing *Ryan*, the *Isaacson* court acknowledged that it was a contradictory decision. *Isaacson*, 304 F.Supp. at 445.  It declared, however, that the *Ryan* decision was "no longer persuasive" and went on to discuss Fifth Circuit cases that specifically rejected the *Ryan* conclusion. *See Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 392 (5th Cir. 1998)(holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute); *see also, Miller v. Dow Chemical Company*, 275 F.3d 414, 417 (5th Cir. 2001)(also holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute).  The *Isaacson* court denied remand based on facts that were almost identical to those in *Ryan*.  The *Isaacson* court concluded that the government ordered specifications differed from the specifications for the defendants' commercial application of the product. *Isaacson, supra* at 450.  In

addition, the method of warning and application was completely in the government's hands. *Id.* Finally, the government had full knowledge of the dioxin "problem" inherent in the production of Agent Orange. *Id.* These factors demonstrated the control with which the government operated and, thus, warranted a different holding than *Ryan. Id.*

14.    This analysis also applies to "failure to warn" cases where "there is evidence that the government was involved in the decision to give, or not to give, a warning." *Kerstetter v. Pacific Scientific Co.,* 210 F.3d 431, 438 (5th Cir.) *cert. denied* 531 U.S. 919 (2000). The Court of Appeals for the Fifth Circuit has made it clear that the government contractor defense is available in "failure to warn" claims where the evidence shows that the lack of a warning reflects governmental direction or control rather than the unfettered discretion of the product's manufacturer, and applies wherever: 1) the government approved or authorized the warnings which the plaintiff contends were inadequate or incomplete; 2) the warnings provided by the manufacturer conformed to the warnings as approved or authorized by the government; and 3) the manufacturer warned the government as to any product hazards known by the manufacturer but unknown by the government. *Kerstetter,* 210 F.3d at 438.

15.    As stressed in *Kerstetter,* "[t]he government need not prepare the specifications to be considered to have approved them." *Id.* at 435. The only material issue is whether the manufacturer's designs and specifications were subjected to "substantial review" rather than a mere "rubber stamp" approval. *Id.* While this determination is necessarily fact specific, "substantial review" has plainly been shown upon evidence of a "'continuous back and forth' between the contractor and the government." *Id.* In this regard, "[t]he specifications need not address the specific defect alleged; the government need only evaluate the design feature in question." *Id.* Once again, applying these general principles to "failure to warn" claims, the fact that governmental specifications or regulations

did not specifically preclude the exact warning desired by the plaintiff does not take a "failure to warn" claim outside the scope of the government contractor defense so long as the government was involved generally as to the issue of product warnings (or specifically approved the warnings provided by the contractor) and was generally aware of the hazard in question. *Id.* at 438. Stated another way, "[i]nadequacy [of a warning] is not an issue when it is the government's warning in the first place." *Id.* at 438.

16.     The present case is substantially similar to *Kerstetter, supra.* As explained by Hobson:

> [T]he Navy exercised intense direction and control over all written documentation and any safety or caution information that the navy, in its sole discretion, directed be provided with these [GE] turbines.
>
> The U.S. Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by GE to the Navy. GE would not have been permitted, under the specifications, associated regulations and procedures, and especially under the actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a naval vessel, beyond those required by the Navy.
>
> [T]he U.S. Navy had precise specifications, practices and procedures as to the nature of written materials to be delivered with its naval turbines, such as engineering drawings, test reports, and other technical data that could be used as needed by shipboard engineering officers during the life of the equipment. Some of the material was typically compiled into a volume that was generically called a "technical manual." The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval turbines only to the extent directed by the Navy.
>
> [T]he Navy, not GE, determined the nature of warnings communicated to naval personnel in relation to shipboard equipment and materials.

*See* Exhibit C at ¶¶ 2-6. Thus, the presence or absence of warnings regarding GE equipment was strictly controlled by the Navy - and a clear basis for removal exists under § 1442(a)(1).

17.    In further support of the removal, GE provides the Affidavit of Admiral Ben J. Lehman, U.S. Navy, Ret. *See* Affidavit of Admiral Lehman attached hereto as Exhibit D. Admiral Lehman joined the Navy in 1942 and worked as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as Ship Superintendent at the San Francisco Naval Shipyard from 1950 to 1952, and as Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1054. *Id.* at ¶ 1. He also worked as an engineer at GE between 1946 and 1948. *Id.* During his tenure in the Navy and as Ship Superintendent, Admiral Lehman was personally involved with the supervision and oversight of ship alterations and equipment over hauls at the Brooklyn Navy Yard. *Id.* at ¶ 3. Admiral Lehman states in his Affidavit the Navy controlled every aspect of the design and manufacture of equipment intended for installation on Navy vessels and that the Navy could not, and did not, permit its contractors to implement changes from military specifications. *Id.* at ¶¶ 2 and 3. He further states that in the 1940s and afterward, the navy had complete control over every aspect of each piece of equipment including instructions, warnings, drawings, nameplates, texts of instruction manuals and "every other document relating to the construction, maintenance and operation" of equipment of its vessels. *Id.* at ¶ 4. These facts have recently been held sufficient to support removal in a similar case. *See Nesbiet v. General Electric Company, et al.*, 04 CV 9321 (S.D.N.Y March 28, 2005) attached hereto as Exhibit F. Clearly, the Hobson and Lehman Affidavits support federal removal jurisdiction under 28 U.S.C. § 1442(a)(1) and the federal nexus to GE's actions has been established.

18.    A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related state court cases or a contention that judicial economy compels remand. 28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976). The federal

officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of § 1442(a)(1). *Willingham v. Morgan*, 395 U.S. 402, 405 (1960).

19.     GE is not required to notify and obtain the consent of any other defendant in this action in order to remove Plaintiffs' action as a whole under § 1442(a)(1). *See Torres v. CBS News*, 854 F.Supp. 245 (S.D.N.Y. 1994)

20.     As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and correct copies of the process and pleadings served upon GE are being filed with this Notice of Removal. Please note, however, that no Orders have been entered to date.

### Conclusion

21.     Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil action brought in a state court, and the federal district courts have original jurisdiction over the subject matter under 28 U.S.C. § 1442(a)(1) because GE was acting under an officer or agency of the United States.

THEREFORE, General Electric Company, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, removes this action for trial from the Supreme Court of the State of New York, County of New York, on this 19th day of June, 2008.

Respectfully submitted,

By _____
    Michael A. Tanenbaum
    **SEDGWICK, DETERT, MORAN & ARNOLD LLP**
    Three Gateway Center, 12th Floor
    Newark, New Jersey 07102
    (973) 242-0002
    **ATTORNEYS FOR DEFENDANT**
    **GENERAL ELECTRIC COMPANY**

**<u>cc: Via Hand Delivery</u>**

Jerome H. Block, Esq.
LEVY PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 13th Floor
New York, New York 10022
(212) 605-6200
ATTORNEYS FOR PLAINTIFFS

All Known Defense Counsel (via regular mail)



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

VINCENT BATTISTA AND MARIE BATTISTA,

                              Plaintiffs,

- against-

ABEX CORPORATION,
       f/k/a American Brake Shoe Company;
A.O. SMITH WATER PRODUCTS COMPANY;
A.W. CHESTERTON CO., INC.;
AMERICAN STANDARD, INC.;
BORG WARNER CORPORATION;
BURNHAM CORPORATION,
       individually and as successor-in-interest to
       Federal Boiler and Radiator Co.;
CARRIER CORPORATION;
CERTAINTEED CORPORATION;
CRANE CO.;
CRANE PUMPS & SYSTEMS, INC.;
DANA CORPORATION;
DURABLA MANUFACTURING COMPANY;
EMPIRE-ACE INSULATION MFG. CORP.;
FMC CORPORATION,
       individually and on behalf of its former
       Peerless Pumps and Northern Pump;
FOSTER WHEELER ENERGY CORP.;
GARLOCK SEALING TECHNOLOGIES, LLC,
       successor by merger to Garlock, Inc.;
GENERAL ELECTRIC COMPANY;
GENERAL REFRACTORIES CO.;
GEORGIA-PACIFIC CORPORATION:
GOULDS PUMPS INCORPORATED;
HONEYWELL INTERNATIONAL, INC.;
HOPEMAN BROTHERS, INC.;
HOWDEN BUFFALO INC.
       individually and on behalf of B.F. Sturtevant;
IMO INDUSTRIES, INC.,
       as successor to and f/k/a Delaval Turbine,
       Transamerica Delaval and IMO Delaval;
INGERSOLL-RAND COMPANY;
J.H. FRANCE REFRACTORIES COMPANY;

D.O.F.: 4/11/08
Index No.: 08/105277

**SUMMONS**

Plaintiffs designate
NEW YORK COUNTY
as the place for trial.

The basis for venue is
Defendants' place of
business.

Plaintiffs reside at:
1000 Clove Road, Apt. 4B
Staten Island, NY 10301

00114615.WPD

KENTILE FLOORS, INC.;
PEERLESS HEATER COMPANY;
RAPID-AMERICAN CORPORATION,
      as successor-in-interest to Phillip Carey
      Manufacturing Corp.;
TATE ANDALE, INC.,
      Individually and as successor-in-interest to
      C.H. Wheeler Manufacturing Co.;
THE ANCHOR PACKING CO.;
UNION CARBIDE CORP.;
VIACOM INC.,
      successor by merger to CBS Corporation,
      f/k/a Westinghouse Electric Corporation;

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**TO THE ABOVE NAMED DEFENDANTS:**

    *You are hereby summoned* to answer in this action and to serve a copy of your answer, or,
if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's
Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or
within 30 days after the service is complete is this summons is not personally delivered to you within
the State of New York); and in case of your failure to appear or answer, judgment will be taken
against you by default for the relief demanded in the complaint.

Dated:        New York, New York
              April 11, 2008

                          **LEVY PHILLIPS & KONIGSBERG, LLP**
                          *Attorneys for Plaintiffs*

                      By:_____
                          Robert I. Komitor
                          800 Third Avenue
                          New York, N.Y. 10022
                          (212) 605-6205

Defendants Address:
SEE ATTACHED LIST

00114615.WPD

## SERVICE LIST

AMERICAN STANDARD, INC.
One Centennial Avenue
P.O. Box 6820
Piscataway, NJ 08855

A.O. SMITH WATER PRODUCTS
COMPANY
11270 West Park Place
Milwaukee, WI 53224

A.W. CHESTERTON CO., INC.
P.O. Box 4004
Woburn, MA 01888-4004

BORG WARNER CORPORATION
3850 Hamlin Road
Auburn, Hills, MI 48326

CERTAINTEED CORPORATION
750 East Swedes Ford Road
P.O. Box 860
Valley Forge, PA 19482

CRANE CO.
c/o CT CORPORATION SYSTEM
111 Eighth Avenue
New York, NY 10011

CRANE PUMPS & SYSTEMS, INC.
420 3rd Street
Piqua, OH 45356-3918

DANA CORPORATION
P.O. Box 1000
Toledo, OH 43697-1000

FMC CORPORATION,
individually and on behalf of its former
Peerless Pumps and Northern Pump
1735 Market Street
Philadelphia, PA 19103

FOSTER WHEELER ENERGY CORP.
Perryville Corporate Park
P.O. Box 4000
Clinton, NJ 08809

GARLOCK, INC.
c/o CT Corp.
111 Eight Avenue
New York, New York 10011

GENERAL ELECTRIC COMPANY
Henry J. King., Jr., Esq.
Managing Attorney
Electric Insurance Company
152 Conant Street
Beverly, MA 01915

GENERAL REFRACTORIES CO.
225 City Avenue, Suite 114
Bala Cynwyd, PA 199004

GEORGIA-PACIFIC CORPORATION
133 Peachtree Street, N.E.
Atlanta, GA 30303

HONEYWELL INTERNATIONAL, INC.
101 Columbia Road
Morristown, NJ 07962-1057

HOWDEN BUFFALO INC.
individually and on behalf of B.F. Sturtevant
2029 West Dekalb Street
Camden, South Carolina 29020

INGERSOLL-RAND CO.
c/o CT Corp.
111 Eight Avenue
New York, New York 10011

00114615 W?D

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

J.H. FRANCE REFRACTORIES
COMPANY
P.O. Box 276
895 Clarence Road
Snow Shoe, PA 16874-0276

KENTILE FLOORS, INC.
c/o G&K Consultants, Inc.
4 Rita Street
Syosset, NY 11791

PEERLESS HEATER COMPANY
Platinum Corporate Services
c/o Borghese Law Firm
1515 Market Street
Philadelphia, PA 19102

TATE ANDALE, INC.,
Individually and as successor-in-interest to
C.H. Wheeler Manufacturing Co.
1941 Lansdowne Road
Baltimore, MD 21227

THE ANCHOR PACKING COMPANY
120 East Ave, Suite 101
Rochester, NY 14604-7356

UNION CARBIDE CORP.
c/o CT Corporation
111 Eighth Avenue
New York, NY 10011

VIACOM, INC.
c/o Asbestos Litigation Support Manager
Eckert Seamans Cherin & Mellott, LLC
Case Management & Technology Center
600 Grant Street, 5th Floor
Pittsburgh, PA 15219

**VIA SECRETARY OF STATE**

ABEX CORPORATION,
    f/k/a American Brake Shoe Company;
BURNHAM CORPORATION;
CARRIER CORPORATION;
DURABLA MANUFACTURING CO.;
EMPIRE-ACE INSULATION;
MANUFACTURING CORP.
GOULDS PUMPS INCORPORATED;
HOPEMAN BROTHERS, INC.;
IMO INDUSTRIES, INC.
    as successor to and f/k/a a Delaval
    Turbine Transamerica Delaval and
    IMO Delaval;
RAPID-AMERICAN CORPORATION;

00114615 W7D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

VINCENT BATTISTA AND MARIE BATTISTA,                    D.O.F.: 4/11/08
                                                        Index No.:
                              Plaintiffs,

               - against-                                **COMPLAINT**

ABEX CORPORATION,                                       Plaintiff Demands
        f/k/a American Brake Shoe Company;              A Trial by Jury
A.O. SMITH WATER PRODUCTS COMPANY;
A.W. CHESTERTON CO., INC.;
AMERICAN STANDARD, INC.;
BORG WARNER CORPORATION;
BURNHAM CORPORATION,
        individually and as successor-in-interest to
        Federal Boiler and Radiator Co.;
CARRIER CORPORATION;
CERTAINTEED CORPORATION;
CRANE CO.;
CRANE PUMPS & SYSTEMS, INC.;
DANA CORPORATION;
DURABLA MANUFACTURING COMPANY;
EMPIRE-ACE INSULATION MFG. CORP.;
FMC CORPORATION,
        individually and on behalf of its former
        Peerless Pumps and Northern Pump;
FOSTER WHEELER ENERGY CORP.;
GARLOCK SEALING TECHNOLOGIES, LLC,
        successor by merger to GARLOCK, INC.;
GENERAL ELECTRIC COMPANY;
GENERAL REFRACTORIES CO.;
GEORGIA-PACIFIC CORPORATION:
GOULDS PUMPS INCORPORATED;
HONEYWELL INTERNATIONAL, INC.;
HOPEMAN BROTHERS, INC.;
HOWDEN BUFFALO INC.
        individually and on behalf of B.F. Sturtevant;
IMO INDUSTRIES, INC.,
        as successor to and f/k/a Delaval Turbine,
        Transamerica Delaval and IMO Delaval;
INGERSOLL-RAND COMPANY;
J.H. FRANCE REFRACTORIES COMPANY;

00114612.WPD

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

KENTILE FLOORS, INC.;
PEERLESS HEATER COMPANY;
RAPID-AMERICAN CORPORATION,
     as successor-in-interest to Phillip Carey
     Manufacturing Corp.;
TATE ANDALE, INC.,
     Individually and as successor-in-interest to
     C.H. Wheeler Manufacturing Co.;
THE ANCHOR PACKING CO.;
UNION CARBIDE CORP.;
VIACOM INC.,
     successor by merger to CBS Corporation,
     f/k/a Westinghouse Electric Corporation;

                             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**TO THE ABOVE NAMED DEFENDANTS:**

     Plaintiffs, by their attorneys, LEVY PHILLIPS & KONIGSBERG, LLP, for their Complaint, respectfully allege as follows:

     1.    Plaintiffs repeat and re-allege New York Asbestos Litigation Standard Complaint No. 1 as if fully incorporated herein.

     2.    Plaintiffs are citizens of the State of New York.

     3.    Plaintiff Vincent Battista, has been diagnosed with Mesothelioma and meets the minimum requirement for activation into the active docket pursuant to the Case Management Order governing these actions.

Dated:      New York, New York
           April 11, 2008

                     **LEVY PHILLIPS & KONIGSBERG, LLP**
                     *Attorneys for Plaintiffs*

By:                                  
                     Robert I. Komitor
                     800 Third Avenue
                     New York, N.Y. 10022
                     (212) 605-6205

```
RUN DATE: 03/21/08            STATEN ISLAND UNIVERSITY HOSPITAL           PAGE 1
RUN TIME: 0901                       Specimen Inquiry
RUN USER: MTRUJILLO
```

```
PATIENT: BATTISTA,VINCENT        ACCT #: 010745525       LOC: T2
UNIT #:  000438601               AGE/SX: 77/M            DOB: 08/01/30
REG DR: . PARIKH, NIRUPAMA MD     ROOM/BD:T2017A-A        REG: 02/28/08
                                 STATUS: DIS IN          DIS: 03/06/08
```

```
Specimen: 08:S4027    Received: 03/04/08-2123  Status:  SOUT    Req#: 09124445
                      Spec Type: SURGICAL      Subm Dr: PARIKH, NIRUPAMA MD
```

**ADDENDUM REPORT**

Immunohistochemical studies were performed at GENZYME.
Their report is attached below.
--------------------------------------------------------------------------
GENZYME
521 West 57th Street
Suite 203
New York, N.Y.  10021 (800) 447-5816

GENZYME SPECIMEN:  08-50717612-MH
CASE#:             50723484
PATIENT ID:        50632736
DATE SIGNED OUT:   3/14/08 by Dr. Christina E. Mahle
HOSPITAL ID#:      08:S4027
BODY SITE:         Pleura

CLINICAL DATA:    History of prostate carcinoma.  Evaluate for
adenocarcinoma (lung primary) vs. mesothelioma.
--------------------------------------------------------------------------
INTERPRETATION:  Markedly atypical epithelioid cells, favor
mesothelioma.
--------------------------------------------------------------------------
COMMENT:  Strong reactivity with WT-1 and, more focally, with D2-40
supports mesothelial differentiation.  However, calretinin is
essentially negative in the atypical cells, which is unusual in
epithelioid mesotheliomas.  There is focal positivity for MOC31 and,
very rarely, for Ber-EP4, both of which usually denotes epithelial
differentiation (the epithelial markers B72, 3 and CEA are
negative).  Therefore, a metastatic poorly differentiated
adenocarcinoma cannot be excluded.  Recommend clinical and
radiologic correlation.

| ANTIBODY/TEST | MARKER FOR | RESULTS |
|---|---|---|
| AE-1/AE-3 | Keratins: 40, 48, 50, 52, 54, 56.5, 58, 59, 64, 65, 67 | Positive |

** CONTINUED ON NEXT PAGE **

25

RUN DATE: 03/21/08             STATEN ISLAND UNIVERSITY HOSPITAL             PAGE 2
RUN TIME: 0901                         Specimen Inquiry
RUN USER: MTRUJILLO

| | | |
|---|---|---|
| Ber-EP4 | Epithelial antigen, adenocarcinoma | Few cells immunoreactive |
| CALRETININ | Ca-binding protein, mesothelial cells, sex cord stromal tumors | Few cells immunoreactive |
| MOC31 | Epithelial cells, adenocarcinoma | Focally positive |
| WT-1 | Mesothelial & mullerian tumors, DSRCT | Positive |
| CEA(P) | Carcinoembryonic antigen (polyclonal) adenocarcinoma | Negative |
| TTF-1 | Thyroid transcription factor-1, lung and thyroid carcinomas | Negative |
| CK7 | Keratin: 54 kD, subset of carcinomas (OV-TL 12/30) | Focally positive |
| CK20 | Keratin: 46 kD, subset of carcinomas (Ks 20.8) | few cells immunoreactive |
| PSA | Prostate specific antigen | Negative |
| HPAP | Human prostatic acid phosphatase (PASE/ 4LJ) | Negative |
| D2-40 | Lymphatic invasion, mesothelial/malignant cells/malignant meso-thelioma | Positive |
| B72.3 | Simple epithelium, | Negative |

** CONTINUED ON NEXT PAGE **

26

04/11/2008  08:57    7183905149              SI COURT REPORTERS                    PAGE  04/04

RUN DATE: 03/21/08              STATEN ISLAND UNIVERSITY HOSPITAL              PAGE 3
RUN TIME: 0901                          Specimen Inquiry
RUN USER: MTRUJILLO

SPEC #: 08-C4027        PATIENT: BATTISTA,VINCENT          #010745545    (Continued)

                        adenocarcinoma


**Addendum Signed**                        LAZZARO,BETTE MD 03/18/08

**CLINICAL HISTORY SURGICAL:**
    INDICATION(S) FOR PROCEDURE(S): Lung/prostate cancer

    PRE-OP  DX: Same
    POST-OP DX: Same

    ADDITIONAL HISTORY: 1500 ml cloudy red fluid

**SPECIMEN:**

    Pleural fluid

**GROSS DESCRIPTION:**

    See: C08-4027

        Dictated by: LAZZARO,BETTE MD

* * **FINAL DIAGNOSIS** * *:

    PLEURAL FLUID, CELL BLOCK:

        -    POSITIVE FOR MALIGNANT CELLS.

        -    PAPILLARY ADENOCARCINOMA.

        -    THE LESION IS CONSISTENT WITH THE PRIOR BIOPSY S08-3218.

        -    ALTHOUGH THE TUMOR HISTOLOGICALLY DOES NOT APPEAR TO BE
             OF PROSTATIC ORIGIN, AND APPEARS TO BE OF EITHER LUNG OR
             PLEURAL ORIGIN, A BATTERY OF IMMUNOSTAINS WILL BE PERFORMED, TO
             RULE OUT LUNG VS. MESOTHELIAL ORIGIN.

        -    AN ADDENDUM WILL BE ISSUED.

        -    (SEE ALSO O8:C537)


**Signed** _____(Electronically Signed)_____  LAZZARO,BETTE MD 03/07/08


                        ** END OF REPORT **

B-1

interrogatory.

A. 27.(a)    At this time, the asbestos containing products identified on Chart A usually came packaged in either cardboard boxes, pails or bags and varied in size, shape and color. Cement came in a powder form that was ultimately mixed with water or in a premixed paste. Packaging was either pre-formed or was rope-like in appearance. Wire came on spools and/or in boxes. Equipment that contained asbestos in or on it included pumps, boilers, blowers, heaters, reduction gears, compressors, valves and other like equipment. Gaskets usually came in sheets or were pre-formed. Additionally, asbestos dust from machinery and equipment was carried on clothing of machinists, engineers and laborers. To plaintiff's knowledge, decedent never observed any warnings on the products, packages or containers. See also decedent's deposition transcripts.

(b)    To the extent that the asbestos-containing products identified in Chart A came packaged, such packaging varied in appearance, size, dimension, color and/or weight. Further information is provided in the deposition transcripts.

(c)    To the extent that the asbestos-containing products identified in Chart A came packaged, such packaging may have contained various markings including the manufacturer or trade name of the product. In addition, the product itself may have also contained various markings. To Plaintiff's knowledge, decedent never personally observed any warnings about asbestos on product

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

packaging or on the asbestos-containing products themselves.  See also deposition transcripts.

(d)    Decedent, decedent's spouse and Counsel.

28.    Did decedent retire from his employment prior to his death? If so, set forth the following:

(a)    whether said retirement was voluntary or involuntary;

(b)    the effective date of said retirement;

(c)    the name of decedent's employer at the time of retirement;

(d)    the reason for said retirement;

(e)    whether decedent's retirement was related to any claimed asbestos-related injury;

(f)    whether decedent ever received a pension, and if so, the date of receipt and the amounts received; and

(g)    whether any pension payments have been paid to decedent's spouse since decedent's death and, if so, the date of receipt and the amounts received.

A.28.  Yes.

(a)    Voluntary.

(b)    1987.

(c)    New York Sanitation Department.

(d)    Retirement Age.

(e)    No.

00117291.WPD                               29

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(f) .    $1,900.00 per month;

(g)    No.

29. State whether the decedent was exposed (either directly, through a co-worker or otherwise), to any Bankrupt Entity's Asbestos-Containing Materials, or products either mined or manufactured, sold, or distributed by a Bankrupt Entity. If so, state the following:

(a)    As to each and every employer (including military service) the decedent had from the time the decedent was first employed to the present, set forth the following, concerning Bankrupt Entities' products only:

i. Name of employer;

ii. Dates of employment;

iii. Asbestos-related job site and address where Bankrupt Entity's products were being used;

iv. Dates the decedent was at the job site;

v. Job duties at the particular job site;

vi. Bankrupt Entity's Asbestos-Containing Materials or Products to which the decedent was exposed;

vii. Other companies using Bankrupt Entity's Asbestos-Containing Materials or Products at the job site; and

viii. Whether the decedent received any warnings with respect to the use of said product and the nature of those

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

warnings.

(b)    If the decedent was exposed to, used, ingested or inhaled any

Bankrupt Entity's Asbestos-Containing Products at any time other

than in the scope of his employment, state for each such exposure:

i. the date, location and circumstances; and

ii. the type of product and the name of the manufacturer,

distributor, and miner.

A.29.I.    Subject to the foregoing general objection, plaintiff responds as follows:

See attached "Chart A".

30. If you contend that the decedent was exposed to, used, ingested or inhaled

asbestos or Asbestos-Containing Products at any time other than in the scope of

his employment, state for each such exposure:

(a)    the date, location and circumstances; and

(b)    the type of product and the name of the manufacturer, distributor,

and miner.

A.30.    At this time plaintiff is not aware of any exposure to asbestos or asbestos-

containing products outside the scope of decedent's employment.

31. Had the decedent ever been a member of any labor union? If so, state:

(a)    the name and address of each local, national and international labor

union;

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(b)     the inclusive dates of the decedent's membership; and

(c)     any position(s) decedent held with each such labor union, and the

dates during which the decedent held such positions.

A.31.   Yes.

(a)     New York Sanitation Department Union, Teamsters Local 831,

25 Cliff Street, New York, NY 10038.

(b)     1957 - 1985.

(c)     Member.


32.     State whether the decedent had ever seen or received any information,

instruction, direction, warning, or directive, from any source whatsoever,

concerning alleged dangers of exposure to asbestos materials and/or Asbestos-

Containing Products, and if so, identify:

(a)     each such warning, directive, notification, direction, instruction, or

information;

(b)     the means by which such was given to the decedent;

(c)     the source and the date on which it was received by the decedent;

and

(d)     the decedent's response or reaction, including any complaints made

or changes in work habits.

A.32.   Decedent did not recall receiving any warnings.


33.     State whether the decedent had available for use during any period of his

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
605 THIRD AVENUE
NEW YORK, N.Y. 10022

employment, respirators or masks or other dust inhalation inhibitor, or protective gear and, if so, state the following:

    (a)    the period of time during which said items were available;

    (b)    what instructions were given with regard to the use of each of said items;

    (c)    whether the decedent used said items and the dates of his use;

    (d)    whether the decedent ever requested said items, and, if so, when, where and to whom the request was made, and the response to the request.

A.33.  Safety equipment was not available.

34.    State, in the form of an itemized list, all special damages alleged in this lawsuit including, but not limited to, hospital charges, medical charges, medicines, lost wages, funeral expenses, burial or cremation expenses, etc., naming the person or organization to whom each item of expense was paid or is due, and, by whom each item of expense was paid.

A.34.  To be provided.

35.    Identify and give the substance of all written statements, recordings, or videotapes which relate to the facts of this lawsuit and the damages you claim given by you, the decedent or any witness (provided such information is in plaintiff's possession, custody or control and/or such statements, recordings or

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

videotapes are not protected by the attorney-client privilege) in the above-

captioned matter.

35.A.  None.

36.    Did the decedent ever make any claim for, or received any, health or

accident insurance benefits, social security benefits, state or federal benefits for

disabilities, workers' compensation benefits, veterans' benefits, tort claims or

suits, Federal Employers Liability Act claims or suits, Longshoremen and Harbor

Workers Act claims or suits, unemployment compensation insurance benefits, or

early payment from any public or private pensions due to the decedent's disability

or injury or medical condition? If so, state the following:

    (a)    the date and place where each such claim was made;

    (b)    the name and nature of the entity with which the claim was made;

    (c)    any identifying number, such as a docket or petition number, for

        each claim;

    (d)    the defendant, agency, insurer, employer or other entity to or

        against whom the claim was made and its file number;

    (e)    the nature of the claim;

    (f)    whether decedent was examined by a physician and if so, the name

        and address of that physician;

    (g)    the name and address of any attorney who represented the decedent

        with regard to such claims;

    (h)    the result of such claim, including the amount realized by way of

settlement, judgment or award upon the claim. If no settlement,

judgment or award was realized, state the reason therefore; and

(i)    does plaintiff or the decedent's spouse (if different from the

plaintiff) presently receive any such benefits?

A.36.  No.


37. State the following with regard to your asbestos-related legal action:

(a)    Did you or the decedent file an asbestos-related claim in more than

one (1) jurisdiction;

(b)    Identify all of the jurisdiction(s) where an asbestos-related claim

has been filed (whether or not these claims have been dismissed or

discontinued or otherwise resolved) on your or the decedent's

behalf;

(c)    Did you or the decedent file your asbestos-related claim(s) under

more than one (1) Index Number; and

(d)    Provide all of the Index Numbers for all of your or the decedent's

asbestos-related claim(s), including all multiple Index Numbers for

claims filed in New York County.


A.37.  Subject to the foregoing general objection, plaintiff responds as follows:

(a)    No.

(b)    New York County.

( c )  No.

00117291.WPD                          35

(d)    Index No.: 08/105277.

38.    State whether or not you or the decedent have made, filed, or submitted a

Claim Against Bankrupt Entity or received funds in settlement from a Bankrupt

Entity. If so, for each claim state the following:

(a)    the date and place where each such claim was made;

(b)    the name and nature of the entity with which the claim was made;

(c)    any identifying number, such as a docket or petition number, for

each claim;

(d)    the defendant, agency, insurer, employer or other entity to or

against whom the claim was made and its file number;

(e)    the nature of the claim;

(f)    whether the decedent was examined by a physician and if so, the

name and address of that physician; and

(g)    whether you or the decedent received any compensation as a result

of such claim, but not the amount.

A.38. Subject to the foregoing general objection, plaintiff responds as follows:

No.

39.    State whether you have applied to any Bankrupt Entity or Bankruptcy

Court to lift the stay as to your claim or otherwise have attempted to join a

Bankrupt Entity to this action.

LEVY PHILLIPS &
KONIGSBERG. L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

A.39.   Subject to the foregoing general objection, plaintiff responds as follows:

As of the present time, plaintiff has neither applied to any Bankrupt Entity or

Bankruptcy Court to lift the stay nor otherwise attempted to join a Bankrupt Entity

to this action because any such action would be contrary to federal law which

provides that plaintiff is barred from proceeding against any Bankrupt Entities in

this action. Further, any such action would force the Bankrupt Estate or

Settlement Trust to unnecessarily incur litigation costs, thereby causing an

unnecessary drain on trust assets that are designed to benefit asbestos victims.

40.    Did the decedent or his spouse ever file for divorce against the other?

Were the decedent and his spouse ever separated for any period more than 48

hours because of a marital disagreement: If yes, indicate every such incident,

stating the reason for the separation and the length of time of each separation. Did

the decedent and/or his spouse ever seek marital counseling? If so, provide the

inclusive dates of such counseling and the name, address and credentials of the

person consulted.

A.40.   No.

41.    Has a claim been filed for or on behalf of decedent or his spouse seeking

compensation for any alleged asbestos-related condition from any entity,

including settlement trusts? Specify "Yes" or "No" only.

A.41.   No.

42.    If your answers to any of these interrogatories have been based in whole or

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

in part, on decedent's records, identify those records and state the name and

address of the person or entity having custody of those records.

A.42.   Not applicable.

43.     Identify all persons, other than your attorneys, who provided you with any

information used in answering these interrogatories, and state the particular

information each person supplied.

A.43.   Decedent himself and decedent's spouse.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Section VIII (B)(2)(b) of the CMO, the defendants request that plaintiffs produce for inspection and copying, the documents and things identified below. The documents and things identified herein shall be produced for inspection and copying at such time as the answers to the interrogatories herein are filed. The following requests include, but are not limited to, documents that relate to Bankrupt Entities.

You are hereby requested to produce the following documents and things:

1.    All documents identified in your answers to these interrogatories.

R.1.    Such documents will be produced to the extent required by the relevant rules.

2.    A copy of the death certificate of the decedent.

R.2.    Attached (Exhibit A).

3.    A copy of the autopsy report for the decedent.

R.3.    Not applicable.

4.    A copy of the decedent's will and all codicils if the decedent died testate.

R.4.    Objection. Attorney/client privilege, work product privilege.

5.    A copy of any letters of administration which were issued in connection with the decedent's estate.

R.5.    Will be provided when issued.

6.    A copy of an estate tax return filed by the decedent's estate.

00117291.WPD                                    39

R.6.    Objection. Attorney/client privilege, work product privilege.

7.    All documents relating to the decedent's job qualifications and professional licenses held.

R.7.    To be provided if located.

8.    All documents relating to the decedent's membership in any labor trade association or professional organization.

R.8.    Authorizations have been provided to Recordtrak, 651 Allendale Road, King of Prusia, PA 19406.

9.    All documents relating to the decedent's military or foreign service, including and not limited to, personnel records, discharge papers, military occupational specialty qualifications, promotions, reductions or disciplinary actions.

R.9.    Authorizations have been provided to RecordTrak, 651 Allendale Road, King of Prusia, PA 19406.

10.    All documents relating to any claim or demand ever made by the decedent for damages, compensation or other benefits allegedly resulting from any illness or injury, including but not limited to, Claims Against Bankrupt Entities, Industrial Accident Board records, social security disability claim records, federal or state employment compensation claim records, social disability records, pension claim record or any other health or accident insurance claim records.

R.10.    Not applicable.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

11.    All documents in plaintiff's possession, custody or control relating

in any way to the decedent's exposure or possible exposure to asbestos,

Asbestos-Containing Products and/or Asbestos-Containing Materials.

R.11. Objection, attorney/client privilege and work product. Subject to the

objection, plaintiff responds as follows:    At this time, plaintiffs have no

such documents in their possession.

12.    All documents in plaintiff's possession, custody or control relating

in any way to the decedent's exposure or possible exposure to silica,

acids, beryllium, nuclear radiation, ammonia, cadmium, chlorine,

chromate, phosgene, grinding dust, coal dust, cotton dust, nickel, welding

smoke or fumes.

R.12.    At this time, plaintiff has no such documents in her personal

possession.

13.    All documents, of which you have ever become aware, relating in

any way to warnings, potential health hazards, instructions or precautions

regarding the use or handling of, or exposure to, asbestos, asbestos-

Containing Products, and/or Asbestos-Containing Materials.

R.13.    At this time, plaintiff has no such documents in her personal

possession.

14.    All applications prepared or submitted by or on behalf of the

plaintiff or the decedent for life insurance, medical insurance, health and

accident insurance, and/or disability insurance.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

R.14.  At this time, plaintiff has no such documents in her personal possession.

15.    All statements, recorded interviews, films, videotapes, reports, questionnaires, forms or other documents made, submitted, compiled, prepared or filled out by, on behalf of, or under the direction of, plaintiff or the decedent relating in any way to exposure or alleged exposure to asbestos, Asbestos-Containing Products and/or Asbestos-Containing Materials or any other issues  relating to this lawsuit except that information prepared by, for, or at the request of plaintiff's counsel must be identified (including the date made), but need not be produced without an order by the Court, provided that written or recorded communication between plaintiff and counsel, made after an attorney-client relationship has been established, and attorney work product, need not be produced or identified.

R.15.  Objection. Attorney/client privilege, work product privilege.

16.    All records in plaintiff's possession, custody or control relating to comments, complaints, suggestions, or proposals made to the decedent's employer or the decedent's union, by the decedent or by other employees or union members regarding asbestos exposure.

R.16.  At this time, plaintiff has no such documents in her possession.

17.    All written, recorded, filmed, transcribed or videotaped statements of all parties and non-party declarants pertaining to the subject of this

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

lawsuit, except that information prepared by, for, or at the request of

plaintiff's counsel must be identified (including the date made), but need

not be produced without an order by the Court, provided that written or

recorded communication between plaintiff and counsel made after an

attorney-client relationship has been established, and attorney work

product, need not be produced or identified.

R.17.   Objection. Attorney/client privilege, work product privilege.

18.     All photographs of the decedent at work or in work clothes and all

photographs of all products or conditions complained of in the

decedent's place of employment.

R.18.   At this time plaintiff do not believe she is in possession of

said photographs, however, should same become available they will be

provided.

19.     Copies of all itemized bills covering all the special damages and

losses and expenses claimed in this matter.

R.19.   Bills to be produced if located.

20.     Copies of all reports, correspondence and records from any doctor

who has examined the decedent, any hospital where the decedent has been

treated either as an inpatient or as an outpatient, except for any reports,

records, correspondence, or communications issued by any consulting

physicians who have been retained or specially employed in anticipation of

litigation or preparation for trial and who are not expected to be called as a

00117291.WPD                    43

witness at trial.

R.20.  Authorizations have been provided to RecordTrak, 651 Allendale Road, King of Pussia, PA 19406.

21.  All tissue specimens, tissue slides, and x-ray films and CT scans pertaining to the decedent.

R.21.  See Answer R.20.

22.  Copies of decedent's income tax returns for the last ten years of employment and up to the year of decedent's death as well as any other documents, including economic loss reports, upon which plaintiff relies in support of his claims.  If loss of earnings or earning capacity is alleged or claimed to have occurred before the time of death, include copies of the income tax returns of the decedent from ten years prior to the claimed loss and up to the year of decedent's death.

R.22.  Plaintiff does not make a loss earnings claim.

23.  Any asbestos and/or Asbestos-Containing Products or product packaging of the type to which the plaintiff alleges the decedent was exposed and which the plaintiff has in her possession, custody or control.

R.23.  At this time, plaintiff has no such documents in her personal possession.

24.  All photographs, charts, drawing, diagrams or other graphic representations depicting work conditions at work sites where the plaintiff claims the decedent was exposed to asbestos or Asbestos-Containing

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

Products.

R.24.  To be produced, if any exist.

25.    All invoices, bills, statements and any other writings or records which the plaintiff contends evidence the sale of any Asbestos-Containing Products to the place of the decedent's employment at which plaintiff claims that decedent was exposed to asbestos.  This does not include documents in the possession, custody or control of plaintiff's attorney unless such documents were provided by plaintiff to his/her attorney and are not privileged.

R.25.  At this time, plaintiff has no such documents in her personal possession.

26.    Any written advice, publication, warning, order, directive, requirement, or recommendation, which advised or warned of the possible harmful effects of exposure to or inhalation of asbestos or Asbestos-Containing Products in the possession, custody or control of the plaintiff.

R.26.  At this time, plaintiff has no such documents in her personal possession.

27.    Any accident or incident reports which relate to the facts, circumstances or incidents which form the basis of plaintiff's complaint.

R.27.  At this time, plaintiff has no such documents in her personal possession, other than those produced herewith.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

Dated: New York, New York
May **22**, 2008

LEVY PHILLIPS & KONIGSBERG, L.L.P.

By: _____

Audrey P. Raphael, Esq.
*Attorneys for the plaintiffs*
800 Third Avenue, 13th Floor
New York, New York 10022
(212) 605-6200

00117340.WPD

## CHART A
## JOBSITE-SPECIFIC EXPOSURE HISTORY

### Re: Vincent Battista

| Name of Employer | Dates of Employment | Asbestos related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM¹ Used Personally | Other ACM to Which You Were Exposed² | Other Workers on Jobsite including supervisor | ACM Identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| US Navy | 1949 - 1952 | ADD-133 USS Burdo | 1949 - 1952 | Seaman | At this time, plaintiff believes decedent handled and/or worked with various types of asbestos-containing products and equipment. Plaintiff will further rely upon the testimony of co-workers and other evidence demonstrating the presence of various manufacturers' products. | Plaintiff believes decedent was in the vicinity of others who handled and/or worked with asbestos containing products and equipment. Plaintiff will further rely upon the testimony of co-workers and other evidence demonstrating the presence of various manufacturers' products. | | | |
| US Gypsum Richmond Terrace, Staten Island, NY | Approx. 1953 - 1955 | US Gypsum Plant, New Brighton, NY 1955 | Approx. 1953 - 1955 | Forklift Operator | To Be Provided | To Be Provided | | | |
| US Standard Varnish Co. Elm Park, NY | Approx. 1955 - 1957 | US Standard Varnish Co. Elm Park, NY | Approx. 1955 - 1957 | Paint Mixer | To Be Provided | To Be Provided | | | |

CHART A

JOBSITE-SPECIFIC EXPOSURE HISTORY

Re: Vincent Battista

| Name of Employer | Dates of Employment | Asbestos related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM¹ Used Personally | Other ACM to Which You Were Exposed² | Other Workers on Jobsite including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| NY Sanitation Department, New York, NY | Approx. 1957 - 1985 | Various sites throughout 1957 - 1985 Manhattan Alaska Street, Staten Island, NY | Approx. 1957 - 1985 | Driver | To Be Provided | To Be Provided | | | |
| American Golf Association | Approx. 1985 - 2006 | La Tourette Link Silver Lake Link | Approx. 1985 - 2006 | Grounds Keeper | No known asbestos exposure | No known asbestos exposure | | | |

1.    ACM - Asbestos Containing Materials of Products.

2.    Identify brand and manufacturer names, if known.

00117340.WPD

```
RUN DATE: 03/21/08              STATEN ISLAND UNIVERSITY HOSPITAL         PAGE 1
RUN TIME: 0901                        Specimen Inquiry
RUN USER: MTRUJILLO
```

```
PATIENT: BATTISTA,VINCENT           ACCT #: 010745525        LOC: T2
UNIT #:  000438601                  AGE/SX: 77/M             DOB: 06/01/30
REG DR: PARIKH, NIRUPAMA MD         ROOM/BD:T2017A-A         REG: 02/28/08
                                    STATUS: DIS IN           DIS: 03/06/08
```

```
Specimen: 08:S4027      Received: 03/04/08-2123   Status:  SOUT     Req#: 09124445
                        Spec Type: SURGICAL       Subm Dr: PARIKH, NIRUPAMA MD
```

**ADDENDUM REPORT**

Immunohistochemical studies were performed at GENZYME.
Their report is attached below.
--------------------------------------------------------------------
GENZYME
521 West 57th Street
Suite 203
New York, N.Y.  10021 (800) 447-5816

GENZYME SPECIMEN:   08-50717612-MH
CASE#:              50723484
PATIENT ID:         50632736
DATE SIGNED OUT:    3/14/08 by Dr. Christina E. Mahle
HOSPITAL ID#:       08:S4027
BODY SITE:          Pleura

CLINICAL DATA:    History of prostate carcinoma.  Evaluate for
adenocarcinoma (lung primary) vs. mesothelioma.
--------------------------------------------------------------------
INTERPRETATION:  Markedly atypical epithelioid cells, favor
mesothelioma.
--------------------------------------------------------------------
COMMENT:  Strong reactivity with WT-1 and, more focally, with D2-40
supports mesothelial differentiation.  However, calretinin is
essentially negative in the atypical cells, which is unusual in
epithelioid mesotheliomas.  There is focal positivity for MOC31 and,
very rarely, for Ber-EP4, both of which usually denotes epithelial
differentiation (the epithelial markers B72, 3 and CEA are
negative).  Therefore, a metastatic poorly differentiated
adenocarcinoma cannot be excluded.  Recommend clinical and
radiologic correlation.

| ANTIBODY/TEST | MARKER FOR | RESULTS |
|---|---|---|
| AE-1/AE-3 | Keratins: 40, 48, 50, 52, 54, 56.5, 58, 59, 64, 65, 67 | Positive |

** CONTINUED ON NEXT PAGE **

RUN DATE: 03/21/08                STATEN ISLAND UNIVERSITY HOSPITAL              PAGE 2
RUN TIME: 0901                          Specimen Inquiry
RUN USER: MTRUJILLO

SPEC #: 08-S54027      PATIENT: BATTISTA VINCENT        4016746525      (Continued)

| | | |
|---|---|---|
| Ber-EP4 | Epithelial antigen, adenocarcinoma | Few cells immunoreactive |
| CALRETININ | Ca-binding protein, mesothelial cells, sex cord stromal tumors | Few cells immunoreactive |
| MOC31 | Epithelial cells, adenocarcinoma | Focally positive |
| WT-1 | Mesothelial & mullerian tumors, DSRCT | Positive |
| CEA(P) | Carcinoembryonic antigen (polyclonal) adenocarcinoma | Negative |
| TTF-1 | Thyroid transcription factor-1, lung and thyroid carcinomas | Negative |
| CK7 | Keratin: 54 kD, subset of carcinomas (OV-TL 12/30) | Focally positive |
| CK20 | Keratin: 46 kD, subset of carcinomas (Ks 20.8) | few cells immunoreactive |
| PSA | Prostate specific antigen | Negative |
| HPAP | Human prostatic acid phosphatase (PASE/ 4LJ) | Negative |
| D2-40 | Lymphatic invasion, mesothelial/malignant cells/malignant meso- thelioma | Positive |
| B72.3 | Simple epithelium, | Negative |

** CONTINUED ON NEXT PAGE **

26

RUN DATE: 03/21/08                    STATEN ISLAND UNIVERSITY HOSPITAL                    PAGE 3
RUN TIME: 0901                                  Specimen Inquiry
RUN USER: MTRUJILLO

SPEC #: 08-C402Y          PATIENT: BATTISTA,VINCENT                #010745525    (Continued)

adenocarcinoma

Addendum Signed                                        LAZZARO,BETTE MD 03/18/08

CLINICAL HISTORY SURGICAL:
   INDICATION(S) FOR PROCEDURE(S): Lung/prostate cancer

   PRE-OP  DX: Same
   POST-OP DX: Same

   ADDITIONAL HISTORY: 1500 ml cloudy red fluid

SPECIMEN:

   Pleural fluid

GROSS DESCRIPTION:

   See: C08-4027

      Dictated by: LAZZARO,BETTE MD

* * FINAL DIAGNOSIS * *:

   PLEURAL FLUID, CELL BLOCK:

        -      POSITIVE FOR MALIGNANT CELLS.

        -      PAPILLARY ADENOCARCINOMA.

        -      THE LESION IS CONSISTENT WITH THE PRIOR BIOPSY S08-3218.

        -      ALTHOUGH THE TUMOR HISTOLOGICALLY DOES NOT APPEAR TO BE
               OF PROSTATIC ORIGIN, AND APPEARS TO BE OF EITHER LUNG OR
               PLEURAL ORIGIN, A BATTERY OF IMMUNOSTAINS WILL BE PERFORMED, TO
               RULE OUT LUNG VS. MESOTHELIAL ORIGIN.

        -      AN ADDENDUM WILL BE ISSUED.

        -      (SEE ALSO 08:C537)


Signed _____(Electronically Signed)_____ LAZZARO,BETTE MD 03/07/08

** END OF REPORT **

# EXHIBIT A

# THE CITY OF NEW YORK
## VITAL RECORDS CERTIFICATE

### DEATH TRANSCRIPT

VOID

DATE FILED   THE CITY OF NEW YORK – DEPARTMENT OF HEALTH AND MENTAL HYGIENE

**CERTIFICATE OF DEATH**   Certificate No.   **156-08-016674**

**NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE**
APR 16 2008 01:43 AM

1. DECEDENT'S LEGAL NAME   VINCENT   BATTISTA
(First Name)   (Middle Name)   (Last Name)

| Place Of Death | 2a. New York City 2b. Borough Brooklyn | 2c. Type of Place 1 ☒ Hospital Inpatient 2 ☐ Emergency Dept./Outpatient 3 ☐ Dead on Arrival | 4 ☐ Nursing Home/Long-Term Care Facility 5 ☐ Hospice Facility 6 ☐ Decedent's Residence 7 ☐ Other Specify | 2d. Name of Hospital or other facility (if not facility, street address) New York Harbor Healthcare System (Brooklyn ) |
|---|---|---|---|---|

| Date and Time of Death | 3a. (Month) April | (Day) 12 | (Year) 2008 | 3b. Time 08:12 ☐ AM ☐ PM | 4. Sex Male | 2:04   12   2008 |
|---|---|---|---|---|---|---|

5. Certifier: I certify that death occurred at the time, date and place indicated and that to the best of my knowledge medical injury or poison DID NOT play any part in causing death, and that death did not occur in any unusual manner and was due entirely to NATURAL CAUSES. See instructions on reverse of certificate.

Name of Physician   Zahidul Mondal   (Type or Print)

Address   800 Poly Place, Brooklyn, New York 11209   Date   4/12/2008

| 7a. Usual Residence State New York | 7b. County Richmond | 7c. City Staten Island | 7d. Street Number and Name 1000 Clove Rd. | ZIP Code 10301 | 7e. Inside City Limits? 1 ☒ Yes 2 ☐ No |
|---|---|---|---|---|---|

| 8. Date of Birth (Month) August 1, 1930 | (Day) | (Year) | 9. Age | Under 1 Year Months   Days | Under 1 Day Hours   Minutes | 10. Social Security No. 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 |
|---|---|---|---|---|---|---|

| 11a. Usual Occupation (Type of work done during most of working life. Do not use "retired") Sanitation Worker | 11b. Kind of Business/Industry | 12. Hispanic or A/K/As |
|---|---|---|

| 13. Birthplace (City & State or Foreign Country) Staten Island, NY | 14. Education | 15. Was Decedent of Hispanic Origin? |
|---|---|---|

| 16. Ever in U.S. Armed Forces? 1 ☒ Yes 2 ☐ No | 17. Marital Status 1 ☐ Married 2 ☐ Divorced | Surviving Spouse (If wife, give maiden name) |
|---|---|---|

18. Father's Name (First, Middle, Last)   Rocco   Battista

19. Mother's Maiden Name (Prior to first marriage) (First, Middle, Last)   Frances   Nicolino

| 20a. Informant's Name Maria Battista | 20b. Relationship to Decedent Wife | 20c. Mailing Address 1000 Clove Rd. 4B Staten Island, NY 10301- |
|---|---|---|

| 21a. Method of Disposition 1 ☒ Burial 2 ☐ Cremation 3 ☐ Entombment 4 ☐ 5 ☐ Other Specify | 21c. Place of Disposition (Name of cemetery, crematory, other place) Moravian Cemetery |
|---|---|

| 21c. Location of Disposition (City & State or Foreign Country) Staten Island NI | 22. Date of Disposition April 16, 2008 |
|---|---|

| 22a. Funeral Establishment Matthew Funeral Home and Cremation Services, Inc. | 2380 Victory Boulevard | City & State ZIP Code Staten Island, NY 10314 |
|---|---|---|

VOID

YR 15 (Rev. 01/08)

This is to certify that the foregoing is a true copy as it appears on file in the Department of Health and Mental Hygiene. The Department of Health and Mental Hygiene does not certify to the truth of the statements made thereon, as no inquiry as to the facts has been provided by law.

Do not accept this transcript unless it bears the security features listed on the back. Reproduction or alteration of this transcript is prohibited. Issuance of this transcript does not authorize a purpose the evasion or violation of laws.


Steven P. Schwartz, Ph.D., City Registrar

DATE ISSUED   APR 16 2008

V0081 3177

John A. Turlik, Esq.
Dave Weinberg, Esq.
SEGAL McCAMBRIDGE
SINGER&MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, New York 10022
*Attorney for Garlock Sealing Technologies, LLC,*
*Successor by Merger to Garlock, Inc.*
and *The Anchor Packing Co.*

Suzanne Halbardier, Esq.
BARRY McTIERNAN & MOORE
2 Rector Street, 14th Floor
New York, New York 10006
*Attorney for General Refractories Co.*

Scott R. Emery, Esq.
LYNCH DASKAL EMERY, LLP
264 West 40th Street
New York, NY 10018
*Attorney for Georgia-Pacific Corporation*

Lisa A. Linsky, Esq.
Donald R. Pugliese, Esq.
McDERMOTT, WILL & EMERY, LLP
340 Madison Ave
New York , NY 10173
*Attorney for Honeywell International, Inc.*

Jennifer Darger, Esq.
DARGER & ERRANTE, LLP
116 E.27th Street, 12th Floor
New York, NY 10016
*Attorney for Hopeman Brothers, Inc.*

Joseph Colao, Esq./ Frederick D. Berkon, Esq.
Joseph I. Fontak, Esq.
LEADER & BERKON
630 Third Avenue, 17th Floor
New York, New York 10017
*Attorney for Imo Industries, Inc., as Successor to*
*and F/k/a Delaval Turbine,Transamerica Delaval,*
*Imo Delaval and Peerless Heater Company*

Lisa M. Pascarella, Esq.
PEHLIVAN, BRAATEN & PASCARELLA, L.L.C.
Paytner's Ridge Office Park
2430 Route 34
Manasquan, NJ 08736
*Attorney for Ingersoll-Rand Company*

Abbie Eliasberg Fuchs, Esq.
HARRIS BEACH, PLLC
100 Wall Street, 23rd Floor
New York, NY 10005
*Attorney for Kentile Floors, Inc.*

Robert C. Malaby, Esq.
William J. Bradley, III, Esq.
MALABY & BRADLEY, LLC
150 Broadway, Suite 600
New York, New York 10038
*Attorney for J.H. France Refractories Company*
*and Viacom Inc., Successor by Merger to CBS*
*Corporation,f/k/a Westinghouse Electric*
*Corporation*

Linda Yassky, Esq.
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas, 23rd Floor
New York, New York 10020
*Attorney for Rapid-American Corporation,*
*As Successor-in-interest to Phillip Carey*
*Manufacturing Corp.*

Philip J. O'Rourke, Esq.
McGIVNEY & KLUGER , P.C.
80 Broad Street, Suite 2300
New York, New York 10004
*Attorney for Tate Andale, Inc., Individually and as*
*Successor-in-interest to C.H. Wheeler*
*Manufacturing Co. and Kentile Floors, Inc.*

COUNSEL UNKNOWN FOR:
EMPIRE-ACE INSULATION MFG. CORP.

by depositing a true copy of the same securely enclosed in a post-paid wrapper in the Post Office
regularly maintained by the United States Government in said County of New York directed to said
attorneys.

CORRINNE DONALDSON

Sworn to before me this
23rd day of May, 2008

NOTARY PUBLIC

00117993.WPD

ELLEN T. PINE
Commissioner of Deeds, City of N.Y.
No. 4-1544
Certificate Filed in New York County
Commission Expires November 1, 2009

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK   )
                            )ss.:
COUNTY OF NEW YORK  )

      **CORRINNE DONALDSON** being duly sworn deposes and says she is an employee of Levy Phillips & Konigsberg, L.L.P., the attorneys for the plaintiffs herein, that she is over 18 years of age and is not a party to the within action, that on the 23rd day of May, 2008, a copy of **Plaintiffs' Answer To Defendants' Fourth Amended Standard Set Of Wrongful Death Interrogatories And Request For Production Of Documents** on behalf of **Vincent Battista** was caused to be mailed via first class mail to:

James Walker Smith, Esq.
SMITH ABBOT, L.L.P.
48 Wall Street, Suite 1100
New York, NY 10005
*Attorney for Abex Corporation, f/k/a American Brake Shoe Company*

Nancy McDonald, Esq.
McELROY, DEUTSCH,
MULVANY & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
*Attorney for A.O. Smith Water Products Company*

Julie Evans, Esq.
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, New York 10017
*Attorney for A.W. Chesterton Co., Inc.*
and *Carrier Corporation*

Genevieve MacSteel, Esq.
MCGUIREWOODS
1345 Avenue of the Americas, 7thFloor
New York, New York 10105
*Attorney for American Standard, Inc.*

Anna DiLonardo, Esq.
WEINER LESNIAK, LLP
888 Veterans Memorial Highway
Suite 540
Hauppauge, NY 11788
*Attorney for Borg Warner Corporation*

Judith Yavitz, Esq.
REED SMITH, LLP.
599 Lexington Avenue
New York, N.Y. 10022
*Attorney for Certainteed Corporation; Dana Corporation; and Union Carbide Corp.*

John Fanning, Esq.
CULLEN & DYKMAN LLP
177 Montague Street
Brooklyn, New York 11201
*Attorney for Burnham Corporation, Individually and as Successor-in-interest to Federal Boiler and Radiator Co.; Goulds Pumps Incorporated and Howden Buffalo Inc., Individually and on Behalf of B.F. Sturtevant*

Michael Waller, Esq
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
*Attorney for Crane Co. and Crane Pumps & Systems, Inc.*

William Mueller, Esq.
CLEMENTE MUELLER & TOBIA, P.A.
P.O. Box 1296
Morristown, New Jersey 07962
*Attorney for Durabla Manufacturing Company*

Christopher Hannan, Esq.
KELLEY JASONS MCGOWAN
SPINELLI & HANNA, LLP
120 Wall Street, 30th Floor
New York, NY 10005
*Attorney for FMC Corporation, Individually and on Behalf of its Former Peerless Pumps and Northern Pump*

Diane Pompei, Esq.
Michael A. Tanenbaum, Esq.
SEDGWICK, DETERT, MORAN & ARNOLD LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102
*Attorney for Foster Wheeler Energy Corp.*
and *General Electric Company*

00117993.WPD



LEVY, PHILLIPS & KONIGSBERG, LLP
ATTORNEYS AT LAW
800 THIRD AVENUE
NEW YORK, N. Y. 10022

(212) 605-6200
FAX: (212) 605-6290
E-MAIL: lpk@lpklaw.com
Writer's Direct E-Mail cdonaldson@lpklaw.com

NEW JERSEY OFFICE
QUAKERBRIDGE EXECUTIVE CENTER
101 GROVERS MILL ROAD
LAWRENCEVILLE, NJ 08648
TELEPHONE: (609) 720-0400
FAX: (609) 720-0457

GOSHEN OFFICE
42 PARK PLACE
GOSHEN, NEW YORK 10924

TELEPHONE: (845) 294-2002

May 23, 2008

**VIA FIRST CLASS MAIL**

To:    All Counsel

**Re: Vincent Battista**
**November 2008 Extremis Trial Cluster**

Dear Counsel:

Enclosed please find Plaintiffs' Answers To Defendants' Fourth Amended Standard Set Of Wrongful Death Interrogatories And Request For Production Of Documents for Vincent Battista, along with a copy of his death certificate and pathology report from Staten Island University Hospital, dated March 4, 2008 diagnosing his mesothelioma.

Very truly yours,

LEVY PHILLIPS & KONIGSBERG, LLP

By: Corrinne Donaldson
*Legal Assistant*

:cd
Enclosures

00117996.WPD

SUPREME COURT OF THE STATE OF NEW YORK
ALL COUNTIES WITHIN NEW YORK CITY
------------------------------------------------------------- X

In Re:        NEW YORK CITY NYCAL                In Re: NYCAL
              ASBESTOS LITIGATION                Index No. 08/105277

------------------------------------------------------------- X

This Document Applies To:                        **DEFENDANTS'**
                                                 **FOURTH AMENDED**
**VINCENT BATTISTA**                             **STANDARD SET OF**
                                                 **WRONGFUL DEATH**
                                                 **INTERROGATORIES**
                                                 **AND REQUEST FOR**
                                                 **PRODUCTION OF**
------------------------------------------------------------- X  **DOCUMENTS**


        Defendants, pursuant to CPLR 3130 and in accordance with Section VIII(A)(1)(b)

of the February 19, 2003 Amended Case Management Order ("CMO"), propound the

following interrogatories to plaintiffs, to be answered under oath within the time period

specified by the CMO, and, pursuant to CPLR 3120 and in accordance with Section VIII

(B)(2)(b) of the CMO, request that plaintiffs produce (with copies to each defendant)

such documents within the time period specified by the CMO.

        These interrogatories are continuing in character and require you to file

supplementary answers if you obtain further or different information after serving your

initial answers and before trial, including in such supplemental answers the date upon and

the manner in which such further or different information came to your attention.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

## GENERAL OBJECTION

Plaintiff objects to these discovery requests to the extent they seek information protected as attorney-client privilege and/or work product doctrine.  Finally, plaintiff objects to any discovery request that may be construed as requesting production of Proof of Claim Forms (POCs) and/or other documents reflecting communications between plaintiff and any settlement trust or any other entity made solely for purposes of settlement. See CPLR § 4547.

00117291.WPD

2

## INTERROGATORIES

1.    State the following:

    (a)    your full name, and all other names by which you have been known;

    (b)    age, and date and place of birth;

    (c)    whether you were an adopted child;

    (d)    present marital status, date of current marriage, spouse's maiden name, dates of any prior marriages and the names of any prior spouses, if applicable;

    (e)    present home address;

    (f)    social security number;

    (g)    date of marriage to decedent, if applicable;

    (h)    current spouse's name;

    (i)    date of current marriage;

    (j)    are you the administrator/executor of decedent's estate? If not, please state the name and address of the administrator/executor of the estate; and

    (k)    the county where estate proceedings are pending.

A.1.    (a)    Marie Battista; Marie Diorio.

    (b)    76; February 14, 1932; Staten Island, NY.

    ( c)    Natural.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(d)    Widow.

(e)    1000 Clove Road, Apt. 4B, Staten Island, NY 10301.

(f)    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.

(g)    2/13/1954.

(h)    Not applicable.

(i)    Not applicable.

(j)    To be provided.

(k)    Richmond.

2. State the following for the decedent:

(a)    full name, and all other names by which the decedent had been

known;

(b)    age, and date and place of birth;

(c)    whether the decedent was an adopted child;

(d)    marital status at the time of death, and if applicable, date of that

marriage and   spouse's maiden name, dates of any prior marriages

and the names of any prior spouses;

(e)    home address at time of death;

(f)    social security number;

(g)    date and place of death; and

(h)    whether decedent had any non-asbestos related physical or mental

defect or disability during the year preceding his death. If so, please

00117291.WPD                                    4

specify.

A.2.   (a)    Vincent Battista (Babs).

        (b)    77; August 1, 1930; Staten Island, NY.

        ( c)    Natural;

        (d)    Married; February 13, 1924; Marie Diorio.

        (e)    1000 Clove Road, Apt. 4B, Staten Island, NY 10301.

        (f)    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.

        (g)    April 12, 2008; Brooklyn, NY.

        (h)    No.

3. State the following with regard to the decedent's father and mother:

        (a)    name;

        (b)    current address (if deceased, state last known address);

        (c)    the current condition of each one's health, including any specific

                medical problems.  If either of the decedent's parents is deceased,

                please state for each deceased parent:

                      i. specific medical problems;

                      ii. date and place of death;

                      iii. age and cause of death for each parent.

A.3.   (a)    Mother: Frances Battista;     Father: Rocco Battista.

        (b)    Mother: Deceased; Clove Lake Nursing Home, Staten Island, NY.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

Father: Deceased; 1077 Castleton Ave., Staten Island, NY.

(c)    Mother: Deceased;       Father: Deceased.

    (i)    Mother: None.    Father: None.

    (ii)    Mother: 2000; Clove Lake Nursing Home, Staten Island, NY.

        Father: 1975; St. Vincent Hospital, Staten Island, NY.

    (iii)    Mother: 95, natural causes.

        Father: 81; stroke.

4. State the following with regard to each of the decedent's children:

    (a)    full name;

    (b)    age, date and place of birth;

    (c)    sex;

    (d)    current address;

    (e)    social security number;

    (f)    whether birth child or adopted child; and

    (g)    current state of each one's health. If any of the decedent's children are deceased, state for each deceased child:

        i. specific medical problems;

        ii. age and date and place of death; and

        iii. cause of death for each child.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

A.4.I.  (a)     Rocco Battista.

        (b)     52, October 14, 1955, Staten Island, NY.

        (c)     Male.

        (d)     64 Laudaten Way, Warwick, NY 10990.

        (e)     To be provided.

        (f)     Birth child.

        (g)     Good health.


A.4.II. (a)     Beth Cicero.

        (b)     49, August 24, 1957; Staten Island, NY.

        (c)     Female.

        (d)     456 Sleight Avenue, Staten Island, NY 10307.

        (e)     To be provided.

        (f)     Birth child.

        (g)     Good health.


A.4.III.(a)     Peter Battista.

        (b)     48, October 9, 1959; Staten Island, NY.

        (c)     Male.

        (d)     293 Decker Avenue, Staten Island, NY 10302.

        (e)     To be provided.

        (f)     Birth child.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y  10022

(g)     Good health.

A.4.IV.(a)     Eva Carbonaro.

(b)     42, October 10, 1965, Staten Island, NY.

(c)     Female.

(d)     169 Center Street, Yarmouth Port, MA 02675.

(e)     To be provided.

(f)     Birth child.

(g)     Good health.

5. List all of the decedent's residences, from birth until the time of death, and the
dates that decedent resided at each address.

A.5.I.  North Burgher Avenue, Staten Island, NY 10310.

Approximately 1930 - 1954.

A.5.II. 304 Pulaski Avenue, Staten Island, NY.

Approximately 1954 - 1964.

A.5.III. 95 Smith Place, Staten Island, NY 10302.

Approximately 1964 - 2000.

A.5.IV. 1000 Clove Road, Apt. 4B, Staten Island, NY 10301.

Approximately 2000 - present.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10002

6. For every physician or other health care provider who ever tested, treated, examined or consulted with the decedent, please state the following for each:

    (a)    name and address of physician or health care provider;

    (b)    date(s) of each test, treatment or examination;

    (c)    treatment or examination given;

    (d)    reason for treatment or examination;

    (e)    symptoms complained of at the time, if any;

    (f)    any diagnosis made; and

    (g)    any drugs or medications prescribed.

A.6.I.  (a)    Dr. Deepak Vadhan, Pulmonologist.

        Staten Island Physician Practice,

        1050 Clove Road, Staten Island, NY 10301.

    (b)    Approximately 1998.

    (c)    Pulmonary evaluation; see medical records.

    (d)    See medical records.

    (e)    See medical records.

    (f)    See medical records.

    (g)    See medical records.

A.6.II.  (a)    Dr. Eric DeLaura, Thoracic Surgeon.

        Staten Island University Hospital,

        475 Seaview Avenue, Staten Island, NY 10306.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(b)    Approximately February 2008.

(c)    Needle biopsy; see medical records.

(d)    Fluid in lung; see medical records.

(e)    See medical records.

(f)    See medical records.

(g)    See medical records.

A.6.III.(a)    Dr. Frank Rosell, Oncologist.

Staten Island University Hospital, Cardio-Thoracic Surgery,

501 Seaview Avenue, Suite 202, Staten Island, NY 10306.

(b)    Approximately February 2008.

(c)    Consultation; see medical records.

(d)    See medical records.

(e)    See medical records.

(f)    See medical records.

(g)    See medical records.

A.6.IV.    (a)    Dr. Phillip Friscia, Oncologist.

Staten Island University Hospital, Nalitt Institute,

256 C Mason Avenue, Staten Island, NY 10305.

(b)    Approximately March 2008.

(c)    Consultation; see medical records.

(d)    See  medical records.

00117291.WPD                                    10

(e)    Mesothelioma; se medical records.

(f)    Mesothelioma (inoperable); see medical records.

(g)    See medical records.

A.6.V. (a)    Dr. Alice Beal, Oncologist.

Brooklyn VA Hospital, 800 Poly Place, Brooklyn, NY 11209.

(b)    Approximately April 2008.

(c)    Consultation; see medical records.

(d)    See medical records.

(e)    See medical records.

(f)    Inoperable mesothelioma, palliative care recommended; see medical records.

(g)    See medical records.

A.6.VI.(a)    Dr. Rajashree Gudi, Oncologist.

1050 Clove Road, Staten Island, NY 10301.

(b)    Approximately February 2008.

(c)    Emergency room visit; see medical records.

(d)    Fluid in lung; see medical records.

(e)    Difficulty breathing; see medical records.

(f)    Mesothelioma; see medical records.

(g)    See medical records.

A.6.VII. (a)    Dr. Michael Chalhoub, Surgeon.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

Staten Island Pulmonary,

501 Seaview Avenue, Staten Island, NY 10305.

(b)    Approximately March 2008.

(c)    Denver Catheter; see medical records.

(d)    Fluid in lungs; see medical records.

(e)    Difficulty breathing; see medical records.

(f)    Mesothelioma; see medical records.

(g)    See medical records.

A.6.VIII. (a)    Dr. Huaxu Cheng, Physician.

Staten Island Physician Practice,

1050 Clover Road, Staten Island, NY 10301.

(b)    Approximately 2006 - 2008.

(c)    See medical records.

(d)    Primary care physician; see medical records.

(e)    See medical records.

(f)    See medical records.

A.6.IX.)a)    Dr. V. Picone, Surgeon.

St. Vincent's Catholic Medical Center,

355 Bard Avenue, Staten Island, NY.

(b)    Approximately 1998.

(c)    Biopsy; see medical records.

00117291.WPD

12

(d)    Right lung nodule; see medical records.

(e)    See medical records.

(f)    See medical records.

(g)    See medical records.

A.6.X.(a)    Dr. Joanne Lamonica, Urologist.

St. Vincent's Catholic Medical Center.

355 Bard Avenue, Staten Island, NY.

(b)    Approximately 2007.

(c)    See medical records.

(d)    See medical records.

(e)    Urinary drip; see medical records.

(f)    See medical records.

(g)    See medical records.

A.6.XI.(a)    Dr. Benjamin Jacobs, Urologist.

Columbia Presbyterian Medical Center,

161 Ft. Washington Avenue, New York, NY 10032.

(b)    Approximately 2007.

(c)    See medical records.

(d)    See medical records.

(e)    See medical records.

(f)    See medical records.

LEVY PHILLIPS &
.KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(g)    See medical records.

7. For every hospital, clinic or health care institution in which the decedent had ever been admitted, treated, tested, or examined, whether as an "in-patient" or as an "out-patient," please state the following for each such visit:

    (a)    name and address of the facility;

    (b)    dates of each test, treatment, examination or hospitalization; and

    (c)    reason for visit to the facility.

A.7.I.    (a)    Staten Island University Hospital,

            475 Seaview Avenue, Staten Island, NY 10305.

       (b)    Approximately 2005.

       (c)    See medical records.

A.7.II.    (a)    St. Vincent's Medical Center

            355 Bard Avenue, Staten Island, NY.

       (b)    Approximately 1998 to 2007.

       (c)    See medical records.

A.7.III.(a)    Brooklyn VA Medical Center

            800 Poly Place, Brooklyn, NY 11209.

       (b)    September 2003.

       (c)    Heart cat herization; see medical records.

8.    Please identify each and every injury which you contend is related to the

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

decedent's exposure to asbestos or Asbestos-Containing Products. For each injury, describe the symptoms that you contend were related to the decedent's injury, the date when the decedent first experienced each such symptom and the date of diagnosis and name of any diagnosing doctor. Indicate the dates that both you and the decedent first became aware of the diagnosis.

A.8.    Decedent sustained a number of asbestos-related injuries, including, but not limited to mesothelioma, pain and suffering, mental and emotional distress, shortness of breath, coughing, weight loss, nausea, loss of appetite, difficulty breathing, fatigue, chest pain, back pain, skin discoloration, respiratory discomfort and all related sequelae. As indicated in decedent's medical records, at various and numerous times, decedent experienced a variety of different and differing symptoms related to his injuries, which are numerous and frequent. At this time, plaintiff is unable to state the precise date of the various symptoms might have first occurred. See medical records for date of diagnosis and name of diagnosing physician.

9.    Describe any pain, incapacity, inability to lead a normal life, inability to work, or disability (including retirement) alleged to have resulted from the decedent's medical conditions), including the date and basis therefor.

A.9.    Decedent experienced shortness of breath, coughing, weight loss,

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

loss of appetite, chest pain, back pain, respiratory discomfort and pain, difficulty breathing, and fatigue, among other things.  His ability to do any tasks that required any physical exertion such as taking walks, playing tennis, sleeping for extended periods of time and standing up from a seated position were significantly diminished. Decedent's asbestos-related condition totally disrupted his life, totally limited him in his everyday activities, interfered with his living a normal life, caused him fear, emotional distress, pain, suffering, discomfort, and ultimately led to his death.

10.    Did the decedent ever have any biopsies or tissue samples taken? If so, please state for each such procedure:

    (a)    the name, address and telephone number of each physician performing such procedures;

    (b)    the address where such procedures were performed;

    (c)    the date when such procedures were performed; and

    (d)    the results, conclusions, and/or diagnosis arising from such procedures, and the dates on which the decedent was advised of the results.

A.10.I.(a)    Dr. Deepak Vadhan, 1050 Clove Road, Staten Island, NY 10301.

    (b)    Staten Island University Hospital,

    475 Seaview Avenue, Staten Island, NY 10305.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(c)    February 2008; see medical records.

(d)    Mesothelioma; see medical records.

11.    Did the decedent ever have any chest x-rays, CT Scans and/or pulmonary function tests?  If so, state:

(a)    the dates and places;

(b)    the reasons;

(c)    the results and/or diagnosis resulting therefrom;

(d)    the location of all chest X-ray and CT Scan films; and

(e)    provide appropriate authorization to obtain all X-rays, CT Scans and pulmonary function tests.

A.11.(a) Decedent had x-rays taken at Staten Island University Hospital, Staten Island Physician Practice and Brooklyn VA Hospital, however medical records may reflect others.  For addresses and dates see responses A.7.I. thru 7.III.

(b)    Fluid in lungs; see medical records.

(c)    See medical records.

(d)    Chest x-ray films and CT Scans should be in the possession of the respective doctors and hospitals.

(e)    Authorizations have been provided to Recordtrak.

12.    Was an autopsy performed on the body of the decedent? If so, for each autopsy, state:

00117291.WPD                                    17

(a)    why the autopsy was ordered;

(b)    the name, address, occupation and professional specialty of each person performing the autopsy;

(c)    the time, date and place where the autopsy was performed; and

(d)    the cause of death shown by the autopsy.

A.12.  No.

13.    If it is claimed that any damages are owing to any person or entity on account of loss of any inheritance as a result of decedent's alleged exposure to asbestos or Asbestos-Containing Products, list all real and personal property owned by the decedent at the time of the decedent's death and where the same was located (clothing and personal effects need not be included). Also, indicate all bank savings accounts maintained in the name of the decedent, indicating that the name and address of the bank and the account number, and state the amount in each account at the time of the decedent's death and state the decedent's net worth (in dollar amount at the time of death).

A.13.  No.

14. Has an estate tax return been filed by the decedent's estate? If yes,

(a)    state the name and address of the person or firm that prepared the return; and

(b)    give the name and present custodian of the return.

00117291.WPD              18

A.14.  To be provided.


15.    Please identify each member of the decedent's household at any time during the last ten years of the decedent's life as follows:

    (a)    the name, age, occupation, present address and relationship to the decedent;

    (b)    the portion of the last 12 months of the decedent's life during which each person was a member of the decedent's household; and

    (c)    whether decedent claimed the individual as a dependant.


A.15.I.(a)    Marie Battista; 76, 1000 Clove Road, Apt. 4B, Staten Island, NY 10301; wife.

    (b)    Decedent's wife lived with him.

    (c)    Yes.


16.    Did the decedent, during the last ten years of the decedent's life, contribute money or other tangible benefits to anyone: If so, for each beneficiary, state:

    (a)    the name and address;

    (b)    the date and place of birth;

    (c)    the relationship to the decedent;

    (d)    the date of each contribution;

    (e)    the reason for each contribution;

    (f)    the amount or value of each contribution;

00117291.WPD

19

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(g)    a description of anything of value the decedent received in exchange for such contribution; and

(h)    the years for which the decedent claimed this person as a dependent for income tax purposes.

A.16.   Decedent provided support to his wife, Marie Battista.

17.    Did the decedent perform services for any of decedent's parents, spouse, former spouse(s) or children: If so, for each person, state:

(a)    the name, address and relationship to decedent of the person for whom the service was performed;

(b)    a description of each service performed for such person;

(c)    the total time spent by the decedent performing the service per year and the frequency with which he performed such service;

(d)    the date the decedent last performed each such service;

(e)    the compensation, if any, the decedent received for performing each service;

(f)    the total cost to such person of getting others to perform each service performed by the decedent; and

(g)    the name, address and occupation of each person performing each such service since the decedent's death.

A.17.   No.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

18.    Please list the decedent's hobbies or major leisure activities in which the decedent engaged during the 20 years prior to decedent's death. If you do not consider the decedent to have had hobbies or to have participated in activities, please describe how the decedent spent his free time.

A.18.   Decedent enjoyed gardening, playing golf, racquetball, paddleball, walking and running in races, exercising and everyday chores around the house.

19.    Did the decedent ever consult or see professionally a psychiatrist, psychologist or counselor? If the answer is yes, please state:

(a)    when such consultation occurred;

(b)    the name of the psychiatrist, psychologist or counselor; and

(c)    the reason of the consultation.

A.19.   No.

20.    Was the decedent ever exposed to or did the decedent ever use, inhale or ingest any of the following substances on a regular basis or at work. If so, state the date(s), place(s), and circumstances thereof.

(a) acids

(b) aluminum

(c) ammonia

(d) arsenic

(e) barium

(f) beryllium

(g) butanol

(h) cadmium

(i) carborundum

(j) chloroethylene

(k) chlorine

(l) chromate

(m) chromite

(n) chromium

(o) coal dust (coal)

(p) coal tar

(q) cotton dust

(r) epoxy

(s) ethanol

(t) grinding dust

(u) iron

(v) isocyanates

(w) isopropanol

(x) lead

(y) live chickens

(z) manganese

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(aa) nickel

(ab) nitrogen dioxide

(ac) nuclear radiation

(ad) ozone

(ae) petroleum distillates

(af) phosgene

(ag) radiation

(ah) silica

(ai) titanium

(aj) toluene

(ak) welding smoke or fumes

(al) zylene

(am) zinc.

A.20.   Decedent was not exposed to these substances on a regular basis.

21.     Did the decedent ever, from birth to the time of death, use cigarettes,

cigars, pipes, smokeless tobacco, or any other tobacco substance? If so, state the

following:

    (a)     the brand and type of tobacco product(s) used (e.g., filter, non-

        filter, chewing tobacco);

    (b)     the dates during which the decedent used each such product;

    (c)     the amount of the product used per day, during each period of time

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(e.g., 2 packs of cigarettes per day for 2 years);

(d)    whether the decedent was ever told by a physician that he was suffering from any disease or illness caused by or contributed to by tobacco; and

(e)    whether the decedent was ever advised by any physician or any other person that use of tobacco products could adversely affect his health and whether the decedent was ever advised to stop using tobacco products. If so, identify each physician or person who gave him any such advice, the dates on which the advice was given, and state exactly what, if anything, the decedent did in response to that advice.

A.21.  Yes;

    (a)    Marlboro, filtered.

    (b)    Approximately 1946 - 1979.

    (c)    Approximately two packs per day.

    (d)    No

    (e)    No.

22.    For each spouse and member of the decedent's household, from each individual's birth until the date of the decedent's death, state whether each individual now uses or ever used cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco substance, and if so, state the following:

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

    (a)     the brand and type of tobacco product(s) used (e.g., filter, non-

             filter, chewing tobacco); and

    (b)     the dates during which they used each such product.

A.22.    Not applicable.

23.    Did the decedent consume alcoholic beverages? If so, state the following:

    (a)     the type of alcoholic beverages consumed;

    (b)     the dates during which the decedent consumed each such alcoholic

             beverage;

    (c)     the amount of such beverage the decedent consumed per day

             during each period of  time; and

    (d)     whether the decedent was ever treated for any illness or disease

             related to his consumption of alcoholic beverages.

A.23.    Decedent may have consumed beer or wine socially on occasion but not on

a regular basis.

24.    Have you, the decedent or the decedent's spouse ever been a party to or a

witness in any lawsuit, court or administrative proceeding? If so, please state:

    (a)     whether you, the decedent or the decedent's spouse were a party or

             witness and if party, whether plaintiff or defendant;

    (b)     the precise name of the lawsuit or proceeding, the court agency in

             which it was brought and the docket number;

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(c)     the nature of the charges or claims and, if you, the decedent or the

decedent's spouse were a witness, the subject matter of the

testimony; and

(d)     the disposition of the case.

A.24.  Yes;

(a)     Decedent's spouse; witness.

(b)     Auto accident.

(c)     Personal injury.

(d)     Settled.


25. Had the decedent ever been a member of the Armed Forces of the United

States? If so, state the following:

(a)     the branch of the service, serial number, and highest rank held;

(b)     the beginning and ending dates of military service;

(c)     the type of discharge received;

(d)     whether decedent received any injury or incurred any illness during

military service; and

(e)     if decedent received a medical discharge, attach a copy hereto and

set forth the medical reasons.


A. 25.  Yes.

(a)     U.S. Navy; 7184707; Seaman.

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

(b)    1949 - 1952.

(c)    Honorable.

(d)    No.

(e)    Not applicable.

26.    As to each and every employer (including military service) the decedent had from the time he was first employed until the time of his death, set forth the following: (Use attached Chart A) Include on the chart all of the decedent's employers where he worked, and all job sites, regardless of whether or not it is alleged that decedent was exposed to asbestos during the employment. Also, include the source of any product identification information provided on Chart A.

A.26.   See attached Chart A .

27. Please state the following with respect to each Asbestos-Containing Product identified on Chart A:

(a)    the color, dimensions, shape, form, texture, weight, appearance and flexibility of each product;

(b)    the appearance of the package or container indicating the manner of packaging, size, dimensions, color and weight;

(c)    the name, logo, label, numerical and alphabetical markings and other markings or words including warnings on the product and package or container; and

(d)    the source of the information provided in response to this

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022



## AFFIDAVIT OF DAVID HOBSON

David Hobson states as follows:

1.      I adopt and incorporate by reference for purposes of this case the statements contained in the affidavit that I executed on October 17, 2003.

2.      By virtue of the knowledge I have obtained over the course of my career concerning the historical practices of GE and the U. S. Navy with regard to the marine steam turbines, I can state that the practices described in my October 17, 2003 affidavit concerning the U. S. Navy's control and direction related to marine steam turbines would have been applicable at least as far back in time as World War II.

3.      The Navy is a military organization that operates according to a specific chain of command.  As part of that organizational structure, the Navy established specific lines of communication that GE and its employees were required to follow in dealings with the Navy and Navy personnel in connection with equipment that GE supplied or serviced for the Navy.  GE and its employees did not have authority to give orders or direction to Navy personnel.  The working relationship between the U.S. Navy and GE with respect to naval turbines is described in greater detail in my October 17, 2003 affidavit.

4.      Because of the nature of its mission, the Navy exercises 100% ironclad control over what goes on its ships.  In this regard, the Navy had precise specifications as to the nature of any information that was to be affixed to equipment supplied to the Navy by GE.  Under the Navy's specifications and procedures, as well as under actual Navy practice as it evolved in the field, GE would not have been

permitted to affix any type of warning or caution statement to a piece of equipment intended for installation onto a naval vessel, beyond those expressly specified by the Navy.

5.    The Navy also had precise specifications as to the nature and contents of all written materials that were to be delivered with naval turbines, such as engineering drawings and other technical data that could be used as needed by shipboard engineering officers during the life of the equipment. Normally these materials were compiled into a volume that was generically called a "technical manual." The Navy required that every piece of equipment such as a naval turbine be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information in a standardized format used by the Navy. This participation included extensive review and editing of drafts of the technical manuals by Navy personnel. The technical manuals were finalized and printed in final form only after the Navy had given its approval and signed off on them. These manuals included safety or hazard information only to the extent directed by the Navy.

6.    During my career, I have observed many pieces of naval equipment both prior to and after installation on ships. Depending upon the time frame, some of these pieces of equipment have had certain safety or caution notices or other data stamped on plates that were attached to them. The content and format of this information is established by the Navy, not by the equipment manufacturers, and concerned matters related to the equipment itself, such as maximum operating pressure, temperature and back pressure. The Navy, not GE, determined the nature of hazards to be subject to any precautionary labeling and the content of the labeling in question. Both under the Navy's specifications and the

Navy's actual practices, it was the Navy, not GE, that determined the nature of any warnings to be affixed to shipboard equipment and materials.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this ___6 TH___ day of October, 2004

DAVID HOBSON

3

## AFFIDAVIT OF DAVID HOBSON

1.      I joined General Electric Company ("GE") in 1969 and was employed there until 1996, when I retired.  My last position with GE was Manager of Navy Customer Service for GE's Navy and Small Steam Turbine business in Fitchburg, Massachusetts.  Since that time I have been involved in several business ventures related to marine steam turbines and the Navy's use thereof.  Before joining GE, I received a degree in Marine Engineering from the Massachusetts Maritime Academy and was licensed for many years as a second assistant engineer by the United States Coast Guard.  I sailed as an engineering officer on steam ships and worked as an engineer in the shipbuilding industry before my employment with GE.  I was involved in marine engineering during my career at GE.  I have personal knowledge of the facts contained herein.

2.      I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers, such as the Inspector of Naval Machinery ("INM"), over the design and manufacture by GE of equipment intended for installation on U.S. Navy vessels, particularly marine steam turbines.

3.      During my 27 years of employment with GE, I had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's purchase and use of marine steam turbines from GE.  Over the same time period, I also had extensive business dealings on behalf of GE with commercial shipyards and/or ship owners in connection with their purchase and use of marine steam turbines from GE.  GE sold its marine steam turbines to the Navy and commercial shipyards and/or ship owners for installation aboard ships.

4.    I have studied military and commercial specifications and other documents dating back to World War II concerning marine steam turbines and have conferred on numerous occasions with Naval officers and others involved in Naval and commercial shipbuilding. I have made frequent trips to Naval and commercial shipyards and have been aboard numerous Naval and commercial vessels in all stages of construction, testing and operation.

5.    I am personally familiar with the extent of U.S. Navy control over the production of turbines built for U.S. Navy vessels by GE because I participated in the design, manufacturing, testing and sea trials of these turbines and personally interacted with the Navy's machinery inspectors. Based on my education, training and experience, I have thorough knowledge of the historical practices of GE with regard to marine steam turbines that were purchased from GE by the Navy and commercial shipyards and/or ship owners for installation aboard ships.

6.    GE manufactured and supplied turbines for U.S. Navy ships under contract between GE and the shipyards and/or United States of America, specifically the Navy Department. That department administered the contract through Navy Sea Systems Command ("NAVSEA"), the Department of the Navy in Washington, D.C., which acted under authority of the Secretary of the Navy. NAVSEA personnel exclusively developed ship designs and plans, as well as comprehensive and detailed guidelines and specifications for all ship equipment. NAVSEA officers supervised, enforced and approved the supplier's compliance with the plans and specifications, which could only be authorized by the Navy through one of its officers.

7.    The INM, a Naval officer subordinate to various levels of command within NAVSEA, supervised GE's production of turbines for Navy vessels. The INM, who worked on-

2

site at GE's Fitchburg and Lynn plants in Massachusetts, exercised direct control over all aspects of GE's production of turbines for Navy vessels. The INM observed the manufacturing process, and enforced compliance with design specifications. All aspects of the design, performance requirements and materials used for construction, including thermal insulation for Navy vessels, were specified by NAVSEA. As manufactured and shipped to the Navy by GE, turbines did not have any thermal insulation materials (whether containing asbestos or otherwise) anywhere on them. GE did not make, sell, or install marine steam turbines with asbestos-containing thermal insulation. Any thermal insulation materials, including thermal insulation blankets, that may have been applied to GE's turbines after they left GE's manufacturing facility would have been supplied and installed by entities other than GE.

8.    GE, during all aspects of its turbine work related to U.S. Navy vessels, performed its work under the immediate supervision of the Navy through NAVSEA officers. Supervision and control were exercised through contract documents, design construction drawings, written specifications and personal oversight of GE's work by ship engineers and machinery specialists employed by the U.S. Navy.

9.    The chain of U.S. Navy authority between GE and the Secretary of the Navy was multi-tiered and staffed by officers of varying levels of responsibility. Virtually no aspect of the development, manufacture and testing of Naval turbines escaped this close control. An extensive set of General Specifications for ships of the United States Navy as well as U.S. Navy specifications or military specifications known as Mil-Specs were already in place prior to construction of a U.S. Navy vessel. The Mil-Specs comprised tens of thousands of pages and

3

governed all aspects of a vessel's design and construction and specified the materials to be used, including asbestos-containing thermal insulation.

10.    The U.S. Navy specifications for GE's marine steam turbines manufactured for the Navy incorporated several lower-level specifications for components or materials used for or with the turbines and governed detailed items like metals, bearings and gaskets. The turbines manufactured and supplied by GE for any U.S. Navy vessel had to meet detailed and precise U.S. Navy specifications. Additionally, each turbine was specifically designed for the vessel or class of vessels in question.

11.    In other words, the turbines for a vessel or class were not interchangeable, but instead, were custom built under direction and control of the Navy. NAVSEA developed the initial conceptual design for all classes of Naval vessels. In the design phase of a turbine project, as in all other phases, the U.S. Navy retained ultimate decision authority. By the time an outside design consultant began to participate in the design phase of a new turbine, the U.S. Navy had specified at least the weight, size, power output, speed, and other design parameters.

12.    If an engineering disagreement arose between the Navy and the outside design consultant, the Navy controlled the design adopted. All final design drawings and specifications required express U.S. Navy approval and adoption. Following the Navy's acceptance of a quotation for manufacture of the prototype turbine, the prototype supplier would begin tooling and constructing under continuing U.S. Navy supervision and oversight during manufacture of a turbine at sites such as the Lynn and Fitchburg plants.

13.    At each of these GE facilities, the INM was on site full time in a separate office called the Defense Contract Management Office. Frequently, GE engineers such as myself dealt

4

directly with the Navy's Turbine Section in Washington, D.C. A number of U.S. Navy civilian employees, including inspectors and engineers, supported the INM on site. At the Lynn and Fitchburg facilities, for example, INM's staff typically included more than three or four full time civilian U.S. Navy inspectors and several mechanical engineers. All members of the INM staff were Navy employees and had access to all areas of the production facility at all times. During the construction of the prototype turbine, all drawings, approvals and any reports of out-of-tolerance machining were submitted to, and approved by, the INM or by the mechanical engineers working under him.

14.     Many steps of the production process required in-process testing. For example, all welds were tested per the Navy design specification. All weld testing reports were reviewed and approved by the INM on site. The INM also approved of the procedures used to test the welds. Similarly, other test results (e.g., balance testing, vibration testing, tolerance measurements, machine variations and the like) were reviewed and approved by the INM. Any reports, which resulted in the replacement of a component part, were also sent to NAVSEA for its review.

15.     Before shipment, the turbine typically was tested per contract specification at the site of manufacture. A detailed test agenda for on-site testing was approved by the U.S. Navy. The agenda included tests for power output or speed at various levels of steam pressure, vibration and noise test, bearing temperature test and the like. The test agenda was then conducted on the turbine. The performance of the test agenda was closely monitored by the INM and all test results were submitted to him. The manufacturer then prepared a final report on the

5

turbine, including all test reports. The final report was then submitted for approval to the on-site INM.

16.      Following INM approval, the final report was forwarded to NAVSEA in Washington, D.C., where further approval was required before the manufacturer could ship the turbine. Following the completion of the test agenda, the turbine was fully disassembled and inspected. This was carried on in the personal presence of the on-site INM. One or more of the INM's mechanical engineers would also attend the disassembly inspection. Any contract design or manufacturing abnormalities discovered at this point would lead to rejection of the turbine or to modifications and re-testing. A report of each tear-down was prepared and was then approved and signed by the INM.

17.      Paralleling the manufacture of the prototype, the U.S. Navy would prepare a Request for Quotation on the production models of the turbine, subject to any changes developed during the production and testing of the prototype turbine unit. Once received, a quotation would then be subject to a similar review as that described above with respect to prototype unit, including quotation review meeting(s). Approval of a quotation would eventually be given to one or more vendors. Often two vendors were selected to supply production turbines. In many instances, the manufacturer of the prototype unit would secure part or all of the contract work for the production units, but in some instances the manufacturer of the prototype would not be selected for the production contract.

18.      The manufacturing process for the production unit then proceeded under the same level and intensity of U.S. Navy scrutiny and supervision as described above for the prototype unit. The INM, assisted by Navy civilian inspectors and mechanical engineers as described

6

above, would oversee and approve virtually every aspect of manufacturing and testing the turbine. As before, a test agenda for the production unit was approved by the U.S. Navy and all reports from the tests were approved by the on-site INM. Following the completion of the test series, each individual turbine was fully torn down in the presence of mechanical engineers working for the INM. Any abnormalities were noted and resolved. A final report was prepared for each turbine, incorporating the test series reports, and was approved by the on-site INM and by the Department of the Navy in Washington, D.C. Re-assembly of each turbine was then approved by the U.S. Navy civilian inspectors prior to shipment.

19.     The first production unit was then shipped to the shipyard that had construction responsibilities for the first vessel (either a Navy shipyard or a civilian yard working under contract with the Navy). The turbine was typically installed by shipyard personnel acting under supervision of engineers from the Navy Supervisor of Shipbuilding, who was subordinate to the Commander of NAVSEA.

20.     Once the turbine was installed, it was typically tested by the shipyard at the dock at some load. This testing was reviewed and approved by U.S. Navy personnel at the shipyard. Any deficiencies discovered at this stage were required to be remedied by GE under Navy direction and supervision. Once the ship was launched and outfitted, sea trials followed. The first sea trial was called the "builder's trial" and was conducted by the shipyard using its personnel with senior U.S. Navy personnel on board for observation and approval. Representatives from the major component vendors would also attend. I have attended more than twelve builder's trials as GE's turbine representative on the builder's trials. Prior to GE, I had engine room installation, operation and testing responsibility for more than twelve Navy

7

ships while employed by a major shipyard. Following successful completion of the builder's

trial, the U.S. Navy would conduct an additional sea trial, called an "acceptance trial."

Acceptance trials were fully conducted and staffed by U.S. Navy officers, civilian employees and

crew, with shipyard and manufacturer's representatives along to observe. As before, any

deficiencies discovered with the turbine during acceptance trials would be corrected by GE under

direction and control of the Navy. Following the acceptance trial, the vessel was commissioned

and would typically embark on a "shake-down cruise." During this cruise, the operation of all

components of the vessel were further evaluated and tested by Navy personnel under the widest

possible range of operating conditions.

    21.    During the launching, outfitting and sea trials of the first vessel of a new class,

other vessels in the class may be under construction on a trailing schedule. Each and every

vessel would go through essentially the same construction, inspection, testing, sea trials and

shake-down procedure as described above for the first vessel of the class. All equipment,

including the turbines supplied by GE, was built in accordance with U.S. Navy specifications in

existence at the time and was approved by the U.S. Navy.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2003.

DAVID HOBSON

8



### AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET.

1.     I am a retired Rear Admiral of the United States Navy. Before joining the Navy in 1942, I received a Bachelor of Science degree in Mechanical Engineering from the College of the City of New York. After joining the Navy, I was ordered to study naval architecture and marine engineering at Massachusetts Institute of Technology (MIT). Later, I completed the United States Post-Graduate School program in Naval Engineering Design. I received a Master of Science in Mechanical Engineering from Harvard University in 1949. I have also studied Design Philosophy and Advanced Stress Analysis at Stanford University. While in the United States Navy, I served as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 and 1952, and as a Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1954. I was promoted to Rear Admiral in 1977 in the Naval Reserve.     I worked as an engineer at General Electric Company between 1946 and 1948. I held the positions of Director of Engineering and Vice-President of Engineering at two major ship building companies between 1969 and 1975. During all these periods I have maintained close contact with the U.S. Navy, including periods of active duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C. I have been an independent consultant since 1975. I have personal knowledge of the facts contained herein.

2.     I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers over every aspect of the design and manufacture of equipment intended for installation on Navy vessels.

3.     During my tenure in the Navy and as Ship Superintendent, I was personally involved with the supervision or oversight of ship alterations and equipment overhauls at the New York Naval Shipyard (formerly the Brooklyn Navy Yard). Any deviation from military specifications of

NJ/130115v1

equipment to be installed on ships would have resulted in significant problems and probable rejection of the equipment. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other equipment and with available materials from the Navy Supply System; (2) compatible with the shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service when shipyard help was unavailable using materials carried onboard.

4.      In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

5.      Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

NJ/130115v1

I declare under penalty of perjury that the foregoing is true and accurate.

Executed this ___ day of October, 2004

Ben F. Lehman, Rear Admiral U.S. Navy, Ret.

Sworn and subscribed to before me
on this ___ day of October, 2004

_____
Notary Public

L. McKAY
Notary Public - State of Nevada
Appointment Recorded in Douglas County
No: 99-36380-5 - Expires June 10, 2007

E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ROBERT NESBIET,

                Plaintiff,

    - against -

GENERAL ELECTRIC CO., et al.,

                Defendants.

------------------------------------------------------------X

**OPINION AND ORDER**

04 Civ. 9321 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

On October 26, 2004, Robert Nesbiet ("Nesbiet") sued General Electric Company ("GE") and other defendants in New York state court alleging, among other things, that he was exposed to asbestos-containing products while employed at the Brooklyn Navy Yard, where he worked on the USS Missouri between 1943 and 1944. Nesbiet is suing GE solely on the theory that it failed to warn of the dangers relating to asbestos used as insulation in marine steam turbines manufactured by GE. On November 29, 2004, GE filed a timely notice of removal asserting federal jurisdiction under the federal officer removal statute.[1] Nesbiet now moves to remand this action to state court.[2]

---

[1]  *See* 28 U.S.C. § 1442(a).

[2]  In addition, GE has moved to stay all proceedings in this Court pending a decision by the Judicial Panel on Multidistrict Litigation on whether to transfer and consolidate this action pursuant to 28 U.S.C. § 1407. This case is

## I.    BACKGROUND

### A.    Plaintiff's Allegations

Nesbiet's exposure to asbestos occurred, in part, during his employment at the Brooklyn Navy Yard, where he worked as a welder and shipfitter during World War II.[3] In October, 2004, Nesbiet was diagnosed with mesothelioma, a cancer of the lining of the lungs caused by exposure to asbestos.[4] GE has confirmed that it manufactured marine steam turbines that were installed on the USS Missouri, a Navy ship that Nesbiet helped construct.[5] Nesbiet has stated that the insulation on these turbines was a source of his asbestos exposure.[6] He alleges that GE failed to provide any warnings regarding asbestos on its

---

scheduled to be considered for transfer to MDL 875, *In re Asbestos Products Liability Litigation*, on March 31, 2005.

[3]    See Plaintiff's Responses to Defendant's Fourth Amended Standard Set of Interrogatories and Request for Production of Documents, Ex. C to Certification of Michael A. Tanenbaum, Counsel to GE, in Support of Defendant's Memorandum of Law ("Tanenbaum Cert."), at 24.

[4]    *See id.* at 9.

[5]    See GE's Notice of Removal ("GE Not.") ¶ 6.

[6]    See Plaintiff's Memorandum of Law in Support of His Motion to Remand at 5 ("Nesbiet Mem.").

turbines.[7] Nesbiet's only claim against GE is for failure to warn about the dangers of asbestos.

### B.    Grounds for Removal

In its notice of removal, GE avers that "in the manufacture and sale of turbines and other equipment for the U.S. Navy, including all aspects of warnings associated with those turbines and equipment, GE was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1)."[8] In support of removal, GE has proffered the following evidence.

### 1.    David Hobson's Affidavits

*First*, GE has submitted four affidavits of David Hobson ("Hobson"), a former GE employee.[9] Hobson began his employment with GE in 1969 and over the course of the following twenty-seven years, "had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's purchase and

---

[7]    *See* Weitz & Luxenberg, P.C., Amended Standard Asbestos Complaint for Personal Injury No. 7, Ex. A to Tanenbaum Cert., ¶ 173.

[8]    GE Not. ¶ 6.

[9]    *See* 10/17/03 Affidavit of David Hobson; 3/31/04 Affidavit of David Hobson ("Hobson 2"); 10/6/04 Affidavit of David Hobson ("Hobson 3"); 2/4/05 Affidavit of David Hobson ("Hobson 4"), Exs. 1-4 to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Remand ("GE Opp.").

use of marine steam turbines from GE."[10]  Prior to his employment by GE, Hobson worked as an engineer at a shipyard and on steam ships, from 1965 until 1969.[11]

The Hobson affidavits show that GE manufactured and supplied turbines for U.S. Navy ships under contracts between GE and the Navy Department or contracts between GE and shipyards that had themselves contracted with the Navy Department.[12]  The Navy Department administered these contracts through Navy Sea Systems Command, whose personnel exclusively developed ship designs and plans, as well as comprehensive and detailed guidelines and specifications for all equipment on U.S. Navy ships.[13]  This portion of the affidavits is uncontroverted.

Nesbiet strenuously objects, however, to those portions of Hobson's affidavits regarding the Navy's control over warnings and, more specifically, whether the Navy prevented GE from providing warnings on the dangers of asbestos.  Hobson declares, in relevant part:

> [T]he Navy had precise specifications as to the nature of any information that was to be affixed to equipment supplied to the

---

[10]    Hobson 2 ¶ 3.

[11]    *See id.* ¶ 1.

[12]    *See id.* ¶ 6.

[13]    *See id.*

Navy by GE. Under the Navy's specifications and procedures, as well as under actual Navy practice as it evolved in the field, GE would not have been permitted to affix any type of warning or caution to a piece of equipment intended for installation onto a naval vessel, beyond those expressly specified by the Navy. The Navy also had precise specifications as to the nature and contents of all written materials that were to be delivered with naval turbines. . . . These [materials] included safety and hazard information only to the extent directed by the Navy. [14]

Nesbiet argues that this and other similar statements contained in Hobson's affidavits could not possibly be based on Hobson's personal knowledge and, in any case, have no basis in fact.[15] When deposed concerning the first two of his affidavits, Hobson admitted that he has no personal knowledge concerning the relationship between GE and the Navy prior to 1965; mentoring from the previous generation of GE engineers was his only source of knowledge with respect to the relevant time period.[16] There is no indication that this mentoring included the subject of the Navy's specifications, procedures or practice concerning asbestos-related warnings during World War II.[17] It follows that Hobson lacks personal

---

[14]    Hobson 3 ¶¶ 4-5.

[15]    Nesbiet Mem. at 7-16.

[16]    *See* Continued Deposition under Oral Examination of David Hobson on July 21, 2004, Ex. B. to Affidavit of Bryan Belasky ("Belasky"), Counsel to Nesbiet, at 217-18.

[17]    After his deposition, Hobson submitted two additional sworn affidavits: Hobson 3 and 4. In the first of these, Hobson asserts that "[b]y virtue

knowledge as to the Navy's control over such warnings when Nesbiet was working on the USS Missouri. Therefore, to the extent that Hobson's affidavits suggest that during the relevant time period the Navy prohibited warnings concerning the dangers of asbestos, the statements are without foundation — and therefore inadmissible — as being beyond the scope of Hobson's personal knowledge and experience.[18]

### 2.    Admiral Ben J. Lehman's Affidavit

*Second*, GE has submitted the affidavit of Ben J. Lehman ("Lehman"), a retired Rear Admiral of the U.S. Navy, who served as a ship

---

of the knowledge I have obtained over the course of my career concerning the historical practice of GE and the U.S. Navy with regard to marine steam turbines, I can state that the practices described in my October 17, 2003 affidavit [Hobson 2] concerning the U.S. Navy's control and direction related to marine steam turbines would have been applicable at least as far back in time as World War II." Hobson 3 ¶ 2. This assertion is insufficient to establish personal knowledge with regard to whether a particular kind of warning was forbidden over twenty years prior to the start of Hobson's career.

[18]    Nesbiet has requested an opportunity to depose Hobson concerning his last two affidavits. This request was granted. As of the date of this opinion, however, Nesbiet has not yet been able to further depose Hobson. Nonetheless, because this Court has concluded that Hobson cannot offer competent evidence concerning the Navy's control over asbestos-related warnings during the relevant time period, Nesbiet is in no way prejudiced by his inability to depose Hobson a second time.

-6-

superintendent for repairs at the Brooklyn Navy Yard between 1942 and 1944.[19]

In that capacity, Lehman "was personally involved with the supervision or oversight of ship alterations and equipment overhauls."[20] Lehman's affidavit states, in relevant part:

> In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. . . . This control included the decision of what warnings should or should not be included. . . . Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all . . . safety and hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of the hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the . . . warnings associated with its ships and did not permit deviation from any of its contractors.[21]

The affidavit thus raises the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning.

---

[19]    *See* Affidavit of Admiral Ben J. Lehman ("Lehman Aff."), Ex. 6 to GE Opp., ¶ 1.

[20]    *Id.* ¶ 3.

[21]    *Id.* ¶¶ 4-5.

-7-

Plaintiff deposed Lehman concerning the foundation for the statements contained in his affidavit. Based on this deposition, plaintiff contends that Lehman, like Hobson, has no personal knowledge of the relevant facts.[22] In that deposition, however, plaintiff did not attack Lehman's competence to make the statements in his affidavit. Rather, plaintiff attacks Lehman's conclusion by asserting that he lacks direct knowledge of warnings or instructions on GE's marine steam turbines in the 1940s. While the deposition reveals that Lehman has no direct knowledge as to whether the Navy specifically prohibited GE, or other manufacturers, from providing warnings about asbestos,[23] Lehman made no such assertion in his affidavit. But, as stated earlier, his affidavit raises the *inference* that the Navy prohibited warnings about asbestos because, based on Lehman's knowledge and experience, the Navy exercised *complete* control over *all* warnings placed on equipment or in accompanying technical manuals by its contractors. By virtue of the position he occupied at the Brooklyn Navy Yard during the relevant time period, Lehman is competent to make the statements contained in his affidavit.

Nesbiet further contests the factual basis for Lehman's affidavit by

---

[22]    *See* 3/24/05 Letter of Belasky to the Court, at I.

[23]    *See* Deposition of Ben Lehman at 32, 77-78, 103-04.

-8-

submitting a number of military specifications, or "milspecs," covering the contents of instruction manuals for electrical and mechanical equipment,[24] which Nesbiet contends "imposed an affirmative requirement to warn on contractors such as GE since at least the 1950s and possibly even earlier."[25]  However, Nesbiet has mischaracterized this so-called requirement.  For example, the earliest of these milspecs, dated October 20, 1952, states that an instruction manual "shall contain data such as the following:  (a) Safety notice (where high voltages or special hazards are involved) (see figure 9)."[26]  "Figure 9" itself consists of detailed instructions on how to safely handle equipment that involves high voltages.[27]  If anything, the milspec requires that the manufacturer provide safety instructions, such as those regarding high voltages, *as dictated by the Navy.*  Moreover, the

---

[24]     *See* Military Specifications, MIL-M-15071A-G, Exs. C through I to Affidavit of Bryan Belasky ("Belasky Aff."), Counsel to Nesbiet.

[25]     Nesbiet Mem. at 15.  Nesbiet proffers that he has been unable to locate the milspec that was in force during WWII.  *See id.* at 16 n.5.

[26]     Interim Military Specification, MIL-M-15071A ("1952 Milspec"), Ex. I to Belasky Aff., at 5.  The second oldest of the milspecs submitted by Nesbiet, dated August 18, 1954, contains identical language to that found in the 1952 milspec.  *See* Military Specification, MIL-M-15071B, Ex. H to Belasky Aff., at 6.

[27]     *See* 1952 Milspec at fig. 9. (stating, for example, "MAKE SURE YOU ARE NOT GROUNDED whenever you are adjusting equipment or using measuring equipment. . . . In general, USE ONE HAND ONLY when servicing live equipment.").

1952 milspec indicates that the content of instruction manuals is subject to the approval of the Navy.[28]  Therefore, these milspecs appear to support, rather than undercut, Lehman's affidavit.

In sum, Lehman's affidavit establishes, for the purposes of this motion, that the Navy controlled the nature of warnings to be included on all equipment (or in the accompanying technical manuals) to be installed on its ships. This evidence in turn supports the inference that no warnings appeared on the turbines or in the written materials because the Navy prohibited them.

### 3.    Dr. Lawrence Stillwell Betts's Affidavit

*Third*, GE has submitted the affidavit of Lawrence Stillwell Betts ("Betts"), a medical doctor and retired U.S. Navy Captain. During his Navy career, which began in 1971 and ended in 2001, Betts became a "qualified surface warfare medical department officer," in which capacity he became "generally familiar with the industrial products that were used by the Navy."[29]  Through his training and experience, Betts is also familiar with "the history and practice of the

---

[28]    *See id.* at 4 ("Prior to the printing of the final instruction books, a preliminary instruction book shall be prepared and submitted in duplicate to the bureau or agency concerned via the Government inspector for approval.").

[29]    Affidavit of Lawrence Stillwell Betts ("Betts Aff."), Ex. 5 to GE Opp., ¶ 1; Curriculum Vitae of Lawrence Stillwell Betts, Ex. A to Betts Aff., at 2-3.

-10-

Navy occupational health program from . . . before World War II until the present time."[30] Betts has supported his conclusions by attaching to his affidavit numerous journal articles, reports, and other documents dating back to before World War II.

Betts's testimony indicates that the Navy's knowledge of the health hazards associated with the use of asbestos aboard Navy vessels during the 1940s represented the state-of-the-art.[31] Consequently, according to Betts's affidavit, GE could not have possessed any information regarding the dangers posed by the use of asbestos-containing products in marine steam turbines that was not already known by the U.S. Navy.[32]

## II.    APPLICABLE LAW

Section 1442(a) of Title 28 provides, in relevant part:

A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district of the United States for the district and division embracing the place wherein it is pending:
(1) The United States or any agency thereof or any officer (or any other person acting under that officer) of the United States or of any agency thereof, sued in an official capacity for any act

---

[30]    *Id.* ¶ 2.

[31]    *See id.* ¶ 31.

[32]    *See id.* ¶¶ 30-31.

-11-

under color of such office.

This statute overcomes the well-pleaded complaint rule by providing a method to remove a case brought in state court against a federal officer, or any person acting under a federal officer, despite the absence of a federal cause of action.[33]  The Supreme Court has noted that one of the purposes of the federal officer removal statute is to ensure that a federal court will adjudicate the validity of a defendant's official immunity defense.[34]  To remove a state court action under the statute, a private party must establish that (1) it has a colorable federal defense, (2) it acted under the direction of a federal agency or officer, and (3) there is a causal nexus between the claims and the conduct performed under the color of federal office.[35]

A defendant seeking removal bears the burden of demonstrating

---

[33]    *See Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

[34]    *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981).

[35]    *See id.*; *Mesa v. California*, 489 U.S. 121, 124-25, 134-36 (1989).  A corporation is a "person" within the meaning of section 1442(a).  *See, e.g., Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998); *McGillick v. World Trade Ctr. Props., LLC*, No. 04 Civ. 3747, 2004 WL 2049260, at *2 (S.D.N.Y. Sept. 13, 2004); *Isaacson v. Dow Chem. Co.*, 304 F. Supp. 2d 442, 447 (E.D.N.Y. 2004); *Arness v. Boeing N. Am., Inc.*, 997 F. Supp. 1268, 1272 (C.D. Cal. 1998); *Good v. Armstrong World Indus.*, 914 F. Supp. 1125, 1127-28 (E.D. Pa. 1996).

-12-

federal subject matter jurisdiction.[36]  Although federal courts generally construe the removal statutes narrowly, remanding doubtful cases to state court,[37] the Supreme Court has emphasized that "the federal officer removal statute is not narrow or limited."[38]  Indeed, "the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'"[39]  Furthermore, "it is axiomatic that the right of the states, consistently with the Constitution and the laws of the United States, to make and enforce their own laws is equal to the right of the federal government to exert exclusive and supreme power in the field that by virtue of the Constitution belongs to it.  The [federal officer] removal statute . . . is to be considered with highest regard for such equality."[40]

The first requirement for federal officer removal — a colorable federal defense — is broadly construed.  "We . . . do not require the officer

---

[36]    See California Pub. Employees' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 100 (2d Cir. 2004).

[37]    See Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 31 (2002); Somlyo v. J. Lu-Rob Enters., Inc., 932 F.2d 1043, 1045-46 (2d Cir. 1991).

[38]    Willingham v. Morgan, 395 U.S. 402, 406 (1969) (quotation marks omitted).

[39]    Manypenny, 451 U.S. at 242 (quoting Willingham, 395 U.S. at 407).

[40]    State of Colorado v. Symes, 286 U.S. 510, 518 (1932).

virtually to 'win his case before he can have it removed.'"[41]  Thus, a defense may

be colorable even if the court ultimately rejects it.[42]  "[A]t the removal stage, it is

not the Court's role to assess the validity of a particular defense.  The Supreme

Court made it clear in [*Willingham v. Morgan*[43]] that the phrase 'under color of . . .

office' allows removal even if, on the record then existing, it could not be said that

'the officers had a clearly sustainable defense.'"[44]

     A defendant meets the second requirement — acting under the

direction of a federal officer — by showing a "substantial degree of direct and

detailed federal control over the defendant's work."[45]  By contrast, a person or

corporation establishing only that the relevant acts occurred under the general

auspices of a federal agency or officer is not entitled to removal under section

---

[41]    *Jefferson County*, 527 U.S. at 431 (quoting *Willingham*, 395 U.S. at 407).

[42]    *See id.*

[43]    395 U.S. 402.

[44]    *Reiser v. Fitzmaurice*, No. 94 Civ. 7512, 1994 WL 54326, at *3 (S.D.N.Y. Feb. 8, 1996) (alteration in original). *See also Symes*, 286 U.S. at 519 (when a defendant seeks removal pursuant to the federal officer removal statute, "no determination of fact is required but it must fairly appear from the showing made that [the defendant's removal] claim is not without foundation and is made in good faith").

[45]    *Isaacson*, 304 F. Supp. 2d at 447.

-14-

1442(a).[46] "Courts generally have not found jurisdiction where the government

officer did not directly require a purported agent to take specific actions."[47]

Finally, to satisfy the third requirement — the existence of a causal

nexus — the defendant must show that the state lawsuit "has arisen out of the acts

done by [the defendant] under color of federal authority and in enforcement of

federal law."[48] In the context of a failure to warn claim, the defendant must

establish that the government's control over warnings directly interfered with the

defendant's ability to fulfill its state law obligation to warn of safety hazards.[49]

## III.    DISCUSSION

---

[46]     See Ryan v. Dow Chem. Co., 781 F. Supp. 934, 947 (E.D.N.Y. 1992);
Good, 914 F. Supp. at 1128.

[47]     McGillick, 2004 WL 2049260, at *3.

[48]     Mesa, 489 U.S. at 131-32.

[49]     See Freiberg v. Swinerton & Walberg Prop. Servs., Inc., 245 F. Supp.
2d 1144, 1155 (D. Colo. 2002) ("What [the defendants] must establish for purpose
of . . . § 1442(a)(1) is that the government authority under which they worked
required them to act as they did.  For purposes of [p]laintiff's failure to warn
claims . . . [the defendants] must establish [that the government's] direction and
control of their activities directly interfered with their ability to fulfill their state
law obligation to warn employees of safety hazards."); Faulk v. Owens-Corning
Fiberglass Corp., 48 F. Supp. 2d 653, 663 (E.D. Tex. 1999) (holding that the
causal nexus requirement of the federal officer removal statute was not satisfied
"[b]ecause the federal government provided no direction or control on warnings
when using asbestos [and] did not prevent [d]efendants from taking their own
safety precautions heeding state-law standards").

A.    "Colorable Federal Defense" Requirement

GE asserts the military contractor defense.[50] This defense shields contractors from liability under state tort law for defects in military equipment supplied to the United States when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."[51] In the context of a failure-to-warn claim, the Second Circuit has held that in order to satisfy the first element of the military contractor defense, the defendant must show that the government itself dictated or otherwise controlled the content of the warnings meant to accompany the product.[52]

In order to satisfy the first prong of section 1442(a), GE must demonstrate merely that its claim to the military contractor defense is "colorable." GE has met this burden. *First*, the Lehman affidavit establishes for the purposes of this motion that the Navy's specifications controlled all aspects of the design

---

[50]    See GE Mem. at 12.

[51]    *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). *See also Grispo v. Eagle-Picher Indus., Inc.*, 897 F.2d 626, 629 (2d Cir. 1990) (holding that the *Boyle* test may apply to a state law failure-to-warn claim).

[52]    See *Grispo*, 897 F.2d at 630.

-16-

and manufacture of marine steam turbines, including the nature of warnings to be affixed to or included with these turbines.[53] *Second*, Lehman asserts that any deviation from these specifications would likely have resulted in rejection of the equipment.[54] This proffer is sufficient, for the purpose of the "colorable defense" prong, to satisfy the requirement that the equipment and accompanying warnings, if any, conformed to the Navy's specifications. *Third*, Betts's affidavit establishes that the Navy's knowledge of the dangers of asbestos on board its ships was state-of-the-art and, therefore, the Navy would have known of any dangers that were known to GE.[55] Thus, GE has shown it has a colorable federal defense.

**B.    "Acting Under" and "Causal Nexus" Requirements**

As stated earlier, GE's proffer has established that the Navy determined the nature of warnings to be included on the turbines and in the accompanying technical manuals and, furthermore, did not permit contractors to deviate from any of its specifications. This evidence in turn raises an inference that GE's alleged failure to warn of the dangers of asbestos resulted from the Navy's prohibition of any such warning. Nesbiet has not effectively rebutted this

---

[53]    *See* Lehman Aff. ¶¶ 4-5.

[54]    *See id.* ¶¶ 3, 5.

[55]    *See* Betts Aff. ¶ 31.

-17-

inference with any evidence of his own. In fact, the milspecs submitted by Nesbiet support rather than undermine GE's evidence. GE's proffer thus establishes, for the purposes of this motion, that (1) the Navy exercised a substantial degree of direct and detailed control over GE's provision of warnings and (2) the Navy's control over warnings directly interfered with GE's ability to fulfill its state law obligation to warn about the dangers of asbestos. GE has therefore satisfied "acting under" and "causal nexus" requirements under section 1442(a).[56]

Nesbiet suggests that in order to meet the "causal nexus" requirement GE must provide direct evidence that the Navy "specifically prohibited it from warning about asbestos."[57] This is more than GE is required to do. The Supreme Court has admonished, "[j]ust as requiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute . . . so

---

[56]    *See Carter v. Acands, Inc.*, No. 3:02-CV-00009, 2002 WL 31682352, at *4 (E.D. Tex. June 27, 2002) (holding in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that the "acting under" requirement of the federal officer removal statute was satisfied because the Navy had ultimate control over warnings affixed to equipment or included in the accompanying written materials); *Madden v. Able Supply Co.*, 205 F. Supp. 2d 695, 702 (S.D. Tex. 2002) (stating in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that "any warnings promulgated (or not promulgated) with respect to the turbines were governed by Navy guidelines. Thus, the causal nexus is axiomatic.").

[57]    Reply Memorandum of Law in Further Support of Plaintiff's Motion to Remand at 5.

-18-

case to the Eastern District of Pennsylvania is moot. The Clerk of the Court is

directed to close these motions (docket # 5 and # 7).


SO ORDERED:


Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           March 28, 2005


-21-

- Appearances -

For Plaintiff:

Bryan Belasky, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
(212) 558-5500


For Defendant:

Michael A. Tanenbaum, Esq.
Sedgwick, Detert, Moran & Arnold, LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102
(973) 242-0002